DC3BDJAC                         Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

VICTOR TR DJANGMAH,

                    Plaintiff,

          v.                          08 CV 4027 (KPF)

NEW YORK CITY POLICE
DEPARTMENT, OFFICER MICHAEL
FALCIONE, and OFFICER JOHN
DOES 1, 2, 4 and 5,

                    Defendants.

-------------------------------x
                                      New York, N.Y.
                                      December 3, 2013
                                      4:11 p.m.

Before:

               HON. KATHERINE POLK FAILLA,

                                      District Judge

                        APPEARANCES

VICTOR TR DJANGMAH, Pro Se Plaintiff

MICHAEL A. CARDOZO, Corporation Counsel
for the City of New York
     Attorneys for Defendant Falcione
BY:  PATRICK NEIL BEATH
     RACHEL AMY SELIGMAN

```
1              (In open court)
2              THE DEPUTY CLERK:  In the matter of Victor Djangmah
3    against the New York City Police Department and Officer Michael
4    Falcione, et al.
5              If the parties could please identify themselves for
6    the record, beginning with plaintiff.
7              MR. DJANGMAH:  Victor TR Djangmah.
8              THE COURT:  Good afternoon, sir.
9              MR. DJANGMAH:  Good afternoon.
10             MR. BEATH:  Patrick Beath, assistant corporation
11   counsel for defendant Falcione.
12             MS. SELIGMAN:  And Rachel Seligman Weiss for
13   defendants as well.
14             THE COURT:  Thank you.  And good afternoon.
15             Now, may I just express a little bit of confusion?
16   Was there another person here last time?
17             MR. BEATH:  Yes, your Honor.  Last time Ms. Krasnow
18   was present at the conference.
19             THE COURT:  And, what, one appearance before me and
20   she's run screaming?  Is that it?  No, that's fine.
21             Okay.  Ms. Seligman, it is lovely to see you.  Will
22   you be on board for this trial?
23             MS. SELIGMAN:  I will be, your Honor.
24             THE COURT:  All right.
25             MS. SELIGMAN:  Thank you very much.
```

DC3BDJAC                    Conference

1          THE COURT:  Well, welcome to the case.

2          All right.  I appreciate very much everyone coming in

3     today, and I did it for several reasons.  In trials there are

4     always a lot of things that kind of occur at the last minute

5     and we want to make sure that things go as smoothly as

6     possible.  So what I wanted to do is to address the remaining

7     discovery issues that we had left over from our last

8     conference, to talk to the parties about the conduct of the

9     trial, and to talk about the things that I will be providing to

10    the parties during the course of the trial.  Specifically what

11    I'm referring to are the voir dire questions that I mentioned

12    earlier, and the request to charge.

13         And without meaning to jump ahead of myself, let me

14    note that I did bring today copies of the-- hopefully I have

15    them.  I'm going to have them shortly.  We're going to get

16    copies of them.  The voir dire that I have drafted and propose

17    to use in this case.  And what I intend to do by, let's say,

18    Thursday, is I will arrange to get to the parties my proposed

19    request to charge.

20         Now, for those of you who do not practice in this

21    courthouse frequently, usually you're getting the request to

22    charge in the middle of trial.  But I think given everything

23    that's going on in this case and all of the moving parts, it

24    might make more sense to have the parties have a couple of

25    days to look at it.  So I, again, hope to get that out by

1    Thursday.

2           That doesn't mean, by the way, that I want to have a

3    three-hour-long charge conferences and objections to every

4    sentence I have.  The charge I'm giving you is what I've given

5    in another case and what other judges have given, so it's not

6    that it's new and untested or anything like that, but it is

7    something that I think is customarily given and it makes sense

8    for you to have it earlier rather than later.

9           So let me then turn, please, to the discovery issues

10   in the case.  And one of them relates to the-- and, I'm sorry,

11   some day I'm going to get his name correctly.  It is either

12   Ivan Eli or Eli Ivan.  But in either event this is the

13   individual who's currently incarcerated who Mr. Djangmah wishes

14   to have testify at the trial.

15          Mr. Djangmah, I hope you've been getting the

16   correspondence along the way.  I did issue an order about a

17   week or so ago requiring his production at trial.

18          Now, my understanding, sir, is that he's going to be

19   brought to the federal facilities here, the Metropolitan--

20   maybe it's the MCC.

21          MR. BEATH:  Correct, your Honor.

22          THE COURT:  Okay.  So, sir, the MCC is the building

23   behind me.  It's next to and across the alley from this

24   courthouse and it is the transitional prison facility where

25   folks who are arrested mostly on charges in the Southern

1    District of New York, where they stay while their cases are

2    being resolved.  Occasionally, however, we bring folks in to

3    serve as witnesses.  So that's where he will be.  I will have

4    him -- I imagine he'll be ready for production on Monday.

5           Mr. Djangmah, I don't know whether you want him to be

6    your first witness and he'd be on the first day or whether he

7    would be on the second day.  And perhaps it may make sense to

8    play that by ear a little bit because I don't know how long it

9    will take for us to select a jury in this case.  But I want you

10   to be aware, he's coming here and so we'll talk in a little

11   bit, but you will want to have questions ready that you can ask

12   him because you'll be conducting his direct examination.  And

13   so you'll ask him nonleading questions about what he saw and

14   observed the night of the incident.

15          And then, Mr. Beath or Ms. Seligman will cross-examine

16   him.  The only concern that I have is because he is a guest of

17   the federal government, we don't want to keep him here forever.

18   So if it turns out that we are done with him on Monday, then

19   I'm going to suggest he be sent back or the process to begin to

20   have him sent back on Monday.  If you need him Tuesday, then

21   Tuesday he's here.  But what I'm saying is I don't want to keep

22   him around unnecessarily.  I just don't want him hanging around

23   for the week because we think it might be a nice idea.

24          We'll determine as trial begins when it is appropriate

25   to call him.  It may be the case -- I offer this to both

1    parties -- that if his examination is almost done and we're at

2    2:30, we might go the extra half an hour just to finish it so

3    that he can go back.  But you had asked, sir, to have him

4    brought and we are bringing him.

5          My understanding -- Mr. Beath, please correct me if

6    I'm wrong -- is that the other individual was not in the

7    custody of the New York Department of Correctional Services?

8          MR. BEATH:  That's correct.  Devon Chambers, we found

9    no record of him being in either the New York City or the New

10   York State custody.

11         THE COURT:  All right.  So we can not produce him if

12   we don't know where he is.

13         Yes, Mr. Djangmah.

14         MR. DJANGMAH:  I object to that because of the fact

15   that I have several issues to address here.  And I don't think

16   that this trial for the 9th will be going forward with respect

17   to other discovery that has just come forth within the past

18   week.  As a matter of fact, Devon Chambers, I have found him

19   and he is right here in this New York State area, within the

20   local facility in Brooklyn.  I have his information.

21         THE COURT:  Okay.

22         MR. DJANGMAH:  And I would like to include him, as

23   well, because he's my primary witness as well.

24         THE COURT:  All right.  Is your--

25         MR. DJANGMAH:  I have his information here that I can

1   share with the Court.

2            THE COURT:  Please do that, yes.  Although that

3   doesn't yet suggest to me that this trial is not going forward

4   next week.  There may be other things, and I'm sure you'll

5   raise them with me at the appropriate time, but if it's just

6   Mr. Chambers -- you understand that he's being held in

7   Brooklyn?

8            MR. DJANGMAH:  Yes.

9            THE COURT:  Okay.  Then let's find out where he is and

10   I have ways of getting him here.

11            MR. DJANGMAH:  Okay.

12            THE COURT:  If it's appropriate.

13            MR. DJANGMAH:  The second issue with Eli Ivan is that

14   I'd also like to -- because I tried to make a visit to go see

15   him and there's several procedures he has to go through in

16   order to make that visit and it wasn't possible for me.  So I'd

17   also like some time where I been down here, which would be much

18   convenient for me to be able to talk to my witness before the

19   trial.  Since they have the opportunity to be able to get their

20   witness ready, so I believe I do have the right to talk to my

21   witness before this trial.

22            THE COURT:  Well, whether you have the right or not is

23   an issue.  I may allow you to talk to him, but even that

24   doesn't suggest-- and don't look at me that way, sir.

25            MR. DJANGMAH:  No, I'm not looking at you in any way.

DC3BDJAC                    Conference

1    I'm just trying to understand --

2              THE COURT:  Okay.  You're trying to understand.  All

3    right.

4              What I'm saying is to the extent that the prison and

5    you, we can reasonably accommodate your visit there, then I

6    will find out how that is done and we will see what can be

7    done.  But, again, it doesn't mean you're getting a week to

8    talk to him.  You may be talking to him the night before he

9    goes on the stand, and that is sufficient time.

10             So, again, I understand.  If there is a way within

11   reason that I can afford you access to him, then we will do

12   that.  But because he will be at the federal facility, we'll

13   have to see how that plays out.

14             Okay.  Please tell me, because I keep asking you this,

15   it's Eli Ivan is his name?

16             MR. DJANGMAH:  Yes.

17             THE COURT:  Because I consistently call him Ivan Eli

18   and eventually I will get the name right.  So, Mr. Ivan, yes.

19   So we'll figure out where he is and we'll see what can be

20   done.

21             All right.  So is there another issue you wanted to

22   talk to me about right now?

23             MR. DJANGMAH:  Yes, there's several other issues.

24   With respect to the last issue we were talking about, that

25   corporation counsel was saying that they don't have a record as

DC3BDJAC                        Conference

 1   far as -- a document of my medical records was faxed from my

 2   last rehab center from Newbridge Services.  I do have the

 3   documentation here, as well, proving that in fact there was a

 4   document sent that I signed that was released to the

 5   corporation counsel as well.

 6           If you might want to --

 7           THE COURT:  I do want to look at it--

 8           MR. DJANGMAH:  Sure.

 9           THE COURT:  -- because, sir, we spoke with Ms. Kaufman

10   at Newbridge Services.  This is the individual that you

11   indicated to us --

12           MR. DJANGMAH:  With a photocopy-- I mean the printout

13   of the fax and everything that went through.

14           THE COURT:  All right.

15           MR. DJANGMAH:  I also have the --

16           THE COURT:  Sir, I apologize, I want to hear you, but

17   I just want to make sure I'm understanding all these things at

18   once.

19           So this is something that was sent on or about May 6th

20   of this year, is what this indicates?

21           MR. DJANGMAH:  Yes.

22           THE COURT:  And this says on May 7th, two pages went

23   through to-- sir, I see what you're sending me and we'll make a

24   copy of what you're sending me and give it back to you.

25   Because the point is we spoke to Ms. Hoffman yesterday and she

DC3BDJAC                    Conference

1   indicated that she received no release and she, therefore,

2   produced no documents.  So I'm not sure what happened, but I

3   can tell you that we talked to her at some length yesterday.

4   She began by saying that she was reluctant to speak to us in

5   the absence of a release.  And when pressed, she indicated--

6   when we explained to her that we weren't asking for the

7   specifics of your medical information, even though you had, in

8   fact, provided us those records, what we were trying to

9   ascertain was whether or not she had ever received a release.

10          What she said to me-- I'm sorry, I should say this

11   conversation was had with my clerk so it was relayed to me.

12   The questions were asked on my behalf and the answers were

13   given to me through the intermediary of my clerk.

14          She explained that there was communication and she had

15   copies of it and we had copies of it regarding permission for

16   you to refrain from appearing at a deposition.  And so she

17   spoke about that, but she had nothing in her files regarding a

18   release and she said, therefore, that she had not produced any

19   documents.

20          So I saw the document.  And just so Mr. Beath and

21   Ms. Seligman are aware of what I'm speaking of, what he has

22   shown me appears to be a medical release.  It actually looks to

23   have been completed twice, and there is a page from a fax

24   transmittal, a fax, indicating that two pages went through on

25   the 7th of May and that the first of those pages was the first

1  page of the release.  All that being said, I can't explain

2  why Newbridge is taking the position that they never received

3  the release and that they, therefore, never produced the

4  documents.  So that is something that right now causes me some

5  concern and we'll have to talk about that.

6          Yes, sir.

7          MR. DJANGMAH:  You're saying you talked to her

8  yesterday.  I never received any call from her as to, you know,

9  my consent to releasing the specifics of my medical records to

10  the Court or to any other party.  I just want to find out how

11  that happened.

12          THE COURT:  It happened, sir, because I asked you at

13  the last conference to provide to Mr. Beath the name of the

14  person with whom you spoke at Newbridge and the case manager at

15  Newbridge.

16          MR. DJANGMAH:  Which I did.

17          THE COURT:  You did.

18          I then took that information and reached out to this

19  person whose name you provided and explained to them that I was

20  not interested in the specifics of your medical records,

21  because I'm not interested in the specifics.  Indeed, I have

22  them because you've given them to me.  What I cared about and

23  what was the issue for me was whether or not she had made a

24  production on your behalf or in response to a release that you

25  had signed.

DC3BDJAC                     Conference

1          Because the key issue, as I mentioned at our last

2     conference, was whether or not the city had received copies

3     of these documents.  If they had been produced in discovery,

4     it may have been appropriate for you to have introduced them

5     at trial, but.  What I can tell you is they haven't produced

6     them in discovery because she says no one ever sent her a

7     release.

8          So I see the document that you've given to me that I'm

9     now photocopying.  I don't understand the disconnect.  I don't

10    understand why she doesn't have a copy.  I don't understand why

11    she has no record of it because she had records that

12    encompassed other things:  This issue of your deposition.  So I

13    can only tell you what she said to me, but in no way was I

14    infringing on any doctor-patient issues or privileges that you

15    had with respect to Newbridge.  I cared only to see whether

16    these documents were produced.

17         And I can tell you that she has no record of your

18    release and no record of their production.  So it raises an

19    interesting issue because I'm very ready at this point to not

20    allow those records in.  Even if they were to come in, you'd

21    have to find someone from Newbridge to substantiate what they

22    are as medical records, as business records, because I'm

23    assuming the City would not just allow you to introduce them

24    without any discussion of what they are.

25         And this, sir, is one of the issues with the Federal

DC3BDJAC                    Conference

1    Rules of Evidence.  You just can't take a document and put it

2    in before the jury and say, Here, this is what it is.  There

3    has to be some attempt at authenticating what the document is.

4    It's saying this is what it is.  And in some cases, sir, the

5    parties will agree the documents are what they say they are,

6    and in some cases the parties will contest that the documents

7    are what they say they are.

8              So I've got a dilemma here because until this moment

9    I was very comfortable precluding, saying no to the

10   introduction of those medical records, but I have now have

11   this issue and I don't know what to do with it.  So I need

12   to think of what to do with it.  At our last conference you

13   very graciously agreed to the defendant's request to adjourn

14   the trial because of an issue they had with one of their

15   witnesses.

16             The problem I have now is no one's yet telling me they

17   want an adjournment, although you hinted at that earlier, and I

18   have this incarcerated defendant who's somewhere between

19   Upstate New York and the MCC.  So I need to figure out what to

20   do with respect to that.

21             Mr. Djangmah, yes.

22             MR. DJANGMAH:  In addition to what you're saying, I

23   have been in direct contact during my going to the program over

24   there in Newbridge with respect to Ms. Krasnow, the former

25   corporation counsel, as well.  Knowing everything --

1    everything, I believe, was in the discovery.  They were aware

2    that I was in treatment and everything was in the summary

3    judgment as well.  So I don't know where this disconnect, as

4    you're referring to it, is coming from.

5         THE COURT:  Well, I'll tell you where I think it's

6    coming from.  There is a difference, sir, between knowing that

7    you are involved in a program administered by the Newbridge

8    folks and knowing that you are intending to introduce the

9    records from Newbridge at your trial.  So it may be that

10   corporation counsel was fully aware that you were in a program

11   that Newbridge was offering.  But what they have said to me and

12   what Ms. Kaufman-- Kaufman or Hoffman?  I'm sorry if I'm

13   getting the name incorrect.  What she said to my law clerk

14   yesterday was that no records were produced to the defense.

15        So that's the difference.  It's one thing to say they

16   should know and the City did know that you were in this

17   program.  I don't think they're disputing that.  They know

18   about it, sir, because there was discussion and, in fact, some

19   submission from Newbridge with respect to the continuation of

20   your deposition.

21        It's a different issue, sir, with respect to the

22   production of these records.  So what I had understood

23   yesterday from our discussions with Newbridge was that they

24   most certainly advised the City regarding your deposition and

25   its continuation or not, but that they did not produce these

1    documents.  So that's the issue.

2              Is there something that I'm not being clear about?

3              MR. DJANGMAH:  No.

4              THE COURT:  Okay.  So I don't know what to do about

5    that.

6              The other open issue is the CCRB information.

7              MR. DJANGMAH:  Okay.

8              THE COURT:  Now, what I've seen here is I have a

9    folder of information.  What I have has the Bates numbers, the

10   numbers at the bottom, NYC 1 through NYC 205.  The issue here

11   is the following.  Mr. Djangmah, let me understand, please, why

12   you-- you know the documents I'm talking about, right, the CCRB

13   information?

14             MR. DJANGMAH:  Yes, I have them right before me.  And

15   I have to address that issue as well.

16             THE COURT:  Please talk to me about that.

17             MR. DJANGMAH:  Right.  With respect to that, when I

18   got that and I started reviewing that, a lot of them are very

19   black.  And if you can see yourself, if I can't read them and

20   the next person can't read them -- I don't know if supposedly

21   the counsel can read them, but I can't see them.  They're all

22   black.  This is what they look like.  This is all what they

23   look like.  I don't know if -- everything is black.

24             THE COURT:  Sir, I understand -- and Mr. Beath or

25   Ms. Seligman will explain this to us.  I understood that when

DC3BDJAC                          Conference

1    they were produced to you, they were produced to you in what's

2    called a redacted format.  This is a redacted format.  I don't

3    know specifically what was redacted.  Mr. Beath is going to

4    tell me what was redacted.  But that's the reason why.

5            So, Mr. Beath, what was redacted?

6            MR. BEATH:  I don't have the CCRB file in front of me,

7    your Honor.  I'm happy to take it from you or take a look at

8    it.  Typically we would --

9            THE COURT:  Mr. Djangmah is willing to hand back his

10   copy.

11           MR. BEATH:  Thank you.

12           THE COURT:  And, Mr. Beath, you know exactly what

13   we're talking about.  There are pages --

14           MR. DJANGMAH:  There's a lot of pages.

15           THE COURT:  -- beginning with, let's say, NYC 68

16   although I've seen --

17           MR. DJANGMAH:  Start from 32 to 35.  It goes on and

18   on, over a hundred pages of almost blanks, nothing but blanks.

19           MR. BEATH:  Your Honor, speaking to that example you

20   just gave, NYC 68 and the following pages, this is an NYPD roll

21   call.  This lists all of the officers who were working during a

22   particular tour out of a particular command on that date.

23   These are redacted because it provides information that is well

24   beyond the scope of plaintiff's complaint in this case.  He has

25   no need to know the names of other officers and the assignments

 1    that they had at this particular command on that particular

 2    date.  And so it's redacted for that reason--

 3              MR. DJANGMAH:  I object to that.

 4              THE COURT:  Mr. Djangmah, you're going to let

 5    Mr. Beath continue and then you're going to tell me why you

 6    object to that.

 7              MR. DJANGMAH:  Sure.

 8              THE COURT:  Let him finish the sentence.  And there

 9    will be an objection that I'll address momentarily.

10              MR. BEATH:  Other redactions are made largely for the

11    same reason.  Where information pertains to other police

12    officers not involved in any fashion in this particular

13    incident or police department activities that are not related

14    to this incident, they've been redacted because they're just

15    not relevant to the matter.

16              For instance, if you look at NYC 29 and the following

17    pages, this is a memo book.  What's been redacted are any

18    entries by this officer that don't pertain to his activities

19    that are related to this incident.

20              THE COURT:  All right.  Well, let me talk again about

21    the stuff that I was showing you, that was more in the 60s of

22    the production.

23              MR. BEATH:  Sure.

24              THE COURT:  So do I understand this to be a grouping

25    of basically everyone in the precinct on a particular day and

DC3BDJAC                       Conference

1    where they were all assigned?

2              MR. BEATH:  On a particular tour within a particular

3    day.  So a certain shift of time, correct.

4              THE COURT:  Right.  Are there three tours per day?

5    Four tours per day?

6              MR. BEATH:  Three tours per day.

7              THE COURT:  So this document is probably the date of

8    the incident that is the subject of plaintiff's complaint?

9              MR. BEATH:  It appears that way.

10             THE COURT:  Okay.  And so on that day there were three

11   shifts of police officers, not all of whom were in the area of

12   the incident?

13             MR. BEATH:  That's correct, your Honor.

14             THE COURT:  All right.  And so to the extent they were

15   not in the area of the incident, their names were redacted?

16             MR. BEATH:  Yes.

17             THE COURT:  Okay.  I understand that.

18             All right.  So, Mr. Djangmah, you object to that.

19   Tell me why.

20             MR. DJANGMAH:  My objection to that is when I went

21   through most of it with the officer's name, that it wasn't

22   produced.  The counsel from the beginning did not produce to me

23   when Judge Maas asked them to produce other than Officer

24   Falcione.  Those officers were on the scene.  They were-- I can

25   understand where you're coming from, from what he's saying.

DC3BDJAC                    Conference

1    There were several officers.  There's tons of officers that are

2    assigned to different patrols and stuff.  But most of what I'm

3    reading from the CCRB report, most of all of these officers

4    with respect to other officers that had -- I think one or two

5    had resigned, all of them were on the scene.  And they are

6    listed as part of his colleagues on the night of the incident.

7    So that's what I'm objecting to.

8               THE COURT:  I understand that.

9               MR. DJANGMAH:  That all the information are black.

10   And that, as I was arguing before, from the beginning, that

11   should have been produced to me, but then they gave me a bad

12   time out for three years now not naming those officers that

13   were involved at the scene.

14               THE COURT:  All right.

15               MR. DJANGMAH:  Which we all know that it wasn't just

16   Officer Falcione that was on the scene that day.

17               THE COURT:  I'm not suggesting that it was just

18   Officer Falcione on the scene, but to the extent that there

19   were officers who went somewhere else, you're not getting those

20   names and you're not seeking those names.

21               MR. DJANGMAH:  No.

22               THE COURT:  What you're saying is you believe that in

23   this mess of black, there are the names of the officers who

24   were involved in the incident that is the subject of your

25   claim.

1          MR. DJANGMAH:  Yes.  And you just see their names on

2     the top and then the rest of the information is all black.

3          THE COURT:  But why would you get more than their

4     names?

5          MR. DJANGMAH:  Excuse me?

6          THE COURT:  But why would you get more than their

7     names?

8          MR. DJANGMAH:  Why?

9          THE COURT:  Let me ask the question differently.

10    Either in this information or in other information that you

11    received in discovery, were you made aware of the officers who

12    were involved or on the scene on the night of the incident?

13    Because I have been told by Mr. Beath that discovery in this

14    case gave you notice of who the officers were.  I don't know if

15    it's in here, and I'm going to ask them that question

16    momentarily, but are you aware of who the officers were that

17    night?

18         MR. DJANGMAH:  No and yes, because those officers-- at

19    the time I didn't know their names.  I know there was a total

20    of at least 11 officers on the scene.

21         THE COURT:  You said 11, but in your Second Amended

22    Complaint, sir -- or at your deposition you said there were

23    four.

24         MR. DJANGMAH:  Yes.  Eleven officers including those

25    four.  In my amended complaint I mentioned four that I was able

1   to specifically-- that they were at the scene.  There were

2   three officers -- Officer Falcione, his two partners -- and

3   then the superior of that allegedly supposedly sexually

4   assaulted me.  So they are not in the docket as well.  And

5   everything there with respect to his colleagues are all black.

6   And why would you give me a filled-out listing with their name

7   and then the rest of the information is black?

8              THE COURT:  Well --

9              MR. DJANGMAH:  It doesn't make sense to me.

10             THE COURT:  All right.  You're going to let me speak.

11  They told me one reason they've done it, they said that these

12  were officers who were not involved.  I'm not going to

13  necessarily say that they've hidden the names of officers that

14  were involved.

15             But let me ask a more preliminary question, and I

16  don't care who answers this.  When were these documents

17  produced to Mr. Djangmah?  Give me a date.

18             MR. BEATH:  I can follow up and give you a specific

19  date, your Honor, but I know --

20             THE COURT:  Give me a year.

21             MR. BEATH:  Early 2010.

22             THE COURT:  2010.

23             MR. BEATH:  Early 2010.

24             THE COURT:  Mr. Djangmah, is it, in fact, the case

25  that you received this CCRB information in or about 2010?

1          MR. DJANGMAH:  I don't recall because in 2010 I was in

2      the custody of ICE.

3          THE COURT:  Okay.  But by the time of the summary

4      judgment motion, which was I think in 2012, had you received

5      these documents?

6          MR. DJANGMAH:  I believe so.

7          THE COURT:  Okay.  Why --

8          MR. DJANGMAH:  Until they send-- no, they sent this to

9      me recently when you asked them to send to me.  I thought I had

10     them, but I didn't have them in my records.  Because everything

11     my fiancée kept when I was in-- everything that came in from

12     court -- that came in from corporation counsel was all piled up

13     for me when I came home to go through.

14         THE COURT:  Okay.  And those materials were still

15     piled up for you when you returned from --

16         MR. DJANGMAH:  Yes, but I didn't see it at the time.

17     I didn't see.  That's why when we were in court, I think the

18     last two conferences, I said I have no recollection of any

19     CCRB report and you ordered them to give me the CCRB reports.

20         THE COURT:  I did.

21         MR. DJANGMAH:  So--

22         THE COURT:  But are you saying to me now that you've

23     never, ever, ever before 2013 received these materials?

24         MR. DJANGMAH:  No, I don't recall.  I don't.

25         THE COURT:  Right.  The problem I have is we are one

1   week from trial.  We are, in fact, less than one week from

2   trial.  And to tell me now that you have objections to the

3   documents, it's too late to tell me you have objections to the

4   documents.

5           MR. DJANGMAH:  No, from the last time you asked them

6   to give it to me, I've been reviewing it with respect to other

7   stuff that I'm doing.  I just found them last week and I had to

8   wait until the conference to bring it up to the Court.

9           THE COURT:  There are letters.  You can send me

10  letters and tell me these things before now.  The bigger issue

11  is this.  The CCRB materials include a lot of things.  The

12  reason I asked you, sir, why you were interested in these

13  materials is the following:  To the extent that you wanted to

14  suggest that Officer Falcione was somehow a bad cop because

15  there was a CCRB proceeding I don't think it's a permissible

16  use of this file.  Because at the end of the day, the CCRB

17  recommended that he be exonerated.  So I think telling the

18  jury that there was a CCRB complaint brought against him when

19  that complaint was brought by you, and when you're here already

20  with a complaint against him, I don't think that adds to

21  anything.

22          There's a separate issue, which I think you're hinting

23  at right now, which is that there's information in here that

24  you want to use.  There may be materials in here, there may be

25  information in here that you are able to get in by yourself.

DC3BDJAC                          Conference

For example, sir, there is a statement that you gave.  You will
be testifying at this trial.  You will be able to tell the jury
your statement.  So it's not as though you need the written
statement that's in here.  If you needed to refresh your
recollection, you'll have it.

          But there are other material-- and there are materials
that may have been prepared by Officer Falcione, perhaps from
his memo book, the notebook that he's filing while he's out
there on the streets, and when he testifies you will certainly
be able to show him his own documents and say, Is this yours?
Did you not file this?  Did you not sign this?  And those
things would likely come in at the trial.

          But there's other stuff here that I have no idea
what it is and there's no effort made to authenticate it for
me.  And I can't just let it in unless someone explains to me
why it should come in and who's going to authenticate it.

          So in terms of the CCRB file, there is information in
here that I think is going to come out at this trial and that
I'm going to let you introduce at the trial, but the whole file
is not coming in because it's hearsay.  So if there are
specific things in there, you will tell me.  You don't have to
do it tonight, but you ought to do it before you try and
introduce them at trial.  And we'll try and figure out -- for
example, if the parties can agree a certain document can come
in, you have the ability, sir, to call Mr. Beath and

DC3BDJAC                        Conference

1    Ms. Seligman and say to them, I would like to introduce the

2    document at NYC whatever and see what their response is.

3          But the whole file should not come in because it's a

4    collection of documents from a collection of people and they're

5    not testifying at this trial.  So I think it doesn't make

6    sense.  The people that I want to hear from are the people who

7    have firsthand knowledge.

8          So that's my view on the CCRB reports.  Again, I

9    remain troubled by the Newbridge issue because my conversation

10   with them-- or, I'm sorry, my clerk's conversation with them

11   was not a short one.  I heard it while it was taking place.  I

12   don't know what to do with this information about the

13   authorization.

14         So, Mr. Djangmah, you just held up a finger.  Is there

15   something else you want to add?

16         MR. DJANGMAH:  Yes.  With respect to the CCRB report,

17   in my opinion it's irrelevant anyway.  As you said, they're

18   not going to even come in.  I'm just making a notice to the

19   Court that if it should come in, I'm objecting to the whole

20   thing because all the CCRB report is not accurate and it's not

21   true as a matter of fact.  That's my opinion.

22         THE COURT:  Okay.  Well, and you're allowed to --

23         MR. DJANGMAH:  Because I know my case and I know what

24   happened.  And I know-- I've made a lot of-- I've talked to a

25   lot of people.  And there's a lot of reviews about the CCRB not

DC3BDJAC                      Conference

 1   being fair and being totally --

 2              THE COURT:  Mr. Djangmah, that's the part I don't care

 3   about.

 4              MR. DJANGMAH:  Exactly.  It's totally irrelevant to me

 5   at this point.  But I just want to make note to the Court that

 6   it is my opinion, as you said, that all the CCRB report is not

 7   banned.  I'm just making note that should --

 8              THE COURT:  Should they want to introduce it, you'll

 9   object.

10              MR. DJANGMAH:  Exactly.

11              THE COURT:  Okay.  But you know what?  I just want to

12   hear this.

13              Mr. Beath, are you introducing anything from the CCRB

14   report?

15              MR. BEATH:  No, your Honor.

16              THE COURT:  Thank you.

17              You understand, Mr. Beath and Ms. Seligman, that if

18   you try, there will be an objection that I'm likely to sustain.

19   Okay.  Well, then I think we're all in agreement on that.  That

20   to my mind is the last of the discovery issues.

21              Again, I'm sorry, Mr. Djangmah, can you please

22   remember at this end of this proceeding that you're going to

23   give to me or my law clerk the information about where

24   Mr. Chambers is residing these days, because I'm going to find

25   out tomorrow morning what's going on.

DC3BDJAC                        Conference

1          MR. DJANGMAH:  I printed out-- my printer got jammed

2     so I just wrote it out.  But that is the facility.

3          THE COURT:  Okay.  Mr. Beath is going to hand

4     Mr. Djangmah his CCRB documents.

5          And can Mr. Beath, please, Mr. Djangmah, take a moment

6     to look at the document you just handed to my law clerk so he

7     understands what it is?

8          MR. BEATH:  Thank you.

9          THE COURT:  I mean because --

10         MR. DJANGMAH:  You can just go to Google and just

11    type in MDC and just put his name there and everything just

12    come up.

13         THE COURT:  May we keep this document, sir?

14         MR. DJANGMAH:  Sure.

15         THE COURT:  Okay.  You can print out another one?

16         MR. DJANGMAH:  Definitely.

17         THE COURT:  Okay.  Let me ask, is there something

18    about this, Mr. Beath, that suggests that perhaps the folks you

19    checked in with were wrong?

20         MR. BEATH:  No.  That looks like it's a printout from

21    the Federal Bureau of Prisons' website.

22         THE COURT:  Oh, you wouldn't have information on that.

23    Okay.

24         MR. BEATH:  I mean, it looks like it may be publicly

25    available, but it's not a source that I checked.  I only looked

1    at state and city --

2         MR. DJANGMAH:  You can just Google it right now and it

3    will just pop up.

4         THE COURT:  Right, although I will say, sir, that at

5    the last proceeding the request that I did make of the

6    defendants was that they check the state and city records.  I

7    did not ask them to check the federal records because I had no

8    understanding -- you now have told me -- that he is actually a

9    federal prisoner.

10        Off the record for a second.

11        (Discussion off the record)

12        THE COURT:  On the record.

13        I will have a conversation with the MDC tomorrow.  I

14   know some people in their legal department.  I will see what I

15   can do about getting him here.  It would be a different form

16   than the one I had to complete.  I think it's called an ASR,

17   although that may just be what the U.S. Attorney's Office uses,

18   but we'll figure it out.

19        Mr. Djangmah, I may be sending you things this week

20   through the intermediary of Mr. Beath, who e-mails them to you,

21   because that is the way that I am sure that you are getting

22   them.  But I tomorrow will look into getting Mr. Chambers.

23        Have you spoken with Mr. Chambers about him testifying

24   in this case?

25        MR. DJANGMAH:  No, not at all.  I tried to and it's

1    the same format of protocol where you have to have the

2    individual supposedly talk to his counsel at the jail and then

3    give an authorization for a visit.  And then you have to know

4    when the visit days and it goes according to the last name.

5              THE COURT:  Okay.

6              MR. DJANGMAH:  So it's something that I need time

7    to -- unless the Court can grant me some type of a pass that I

8    can walk in and talk to him or bring him here when -- I need to

9    talk to him before trial.

10             THE COURT:  I do understand that.  My understanding of

11   what needs to be done at facilities like the MDC is that it is

12   correct that the incarcerated defendant needs to put you on a

13   list of people --

14             MR. DJANGMAH:  Exactly.

15             THE COURT:  -- that are approved visitors.

16             MR. DJANGMAH:  Yes.

17             THE COURT:  Be they family or attorney or friend.  And

18   I don't know what the process is, but Mr. Djangmah --

19             MR. DJANGMAH:  I have the whole process here.

20             THE COURT:  All right.  Let me suggest this, sir.

21   What you may get from me tomorrow is a directive that you

22   proceed in the next day or so to the MDC to try and get

23   yourself set up.  I will talk to them and see what I can do to

24   accelerate the process, but what I'm not able to do is to tell

25   them to abandon their policies.  Because they have, obviously,

1  security reasons.  But I have no desire to move this trial.  So

2  I will talk to the MDC tomorrow to see what can be done.  So

3  check your e-mail.

4            MR. DJANGMAH:  Thank you.

5            THE COURT:  All right.  Is there more evidentiary

6  issues or is this a trial issue?

7            MR. DJANGMAH:  You also mentioned the last time

8  that my Harlingen medical records was not introduced even

9  though --

10           THE COURT:  I didn't hear what you said.

11           MR. DJANGMAH:  My Harlingen records.  I also have

12  that over here, my medical records of my injury.  I also have

13  that.  That was also in the summary judgment, but they claimed

14  they don't have it on their file.

15           THE COURT:  These are not the St. Barnabas records?

16  These are some other records?

17           MR. DJANGMAH:  These are the Harlingen records that I

18  signed for that Judge Maas ordered me directly to go that same

19  day with Ms. Krasnow to their office to sit down with him-- to

20  sit down with her to authorize.  And she showed me how to do

21  it, to, you know, authorize my medical records for the...

22           THE COURT:  All right.  Mr. Beath, do you know of

23  records of which he speaks?

24           MR. DJANGMAH:  I have that, as well, here.

25           MR. BEATH:  Yes, he did release the Harlingen medical

1    records.

2              THE COURT:  I'm sorry, I'm mishearing the name.

3              MR. BEATH:  Harlingen.

4              THE COURT:  Thank you.

5              MR. BEATH:  H-a-r-l-i-n-g-e-n.

6              THE COURT:  Thank you.  Harlingen.  Thank you.

7              And what are those?

8              MR. BEATH:  They appear to be records of

9    Mr. Djangmah's medical treatment in September of 2008 and

10   December of 2008, while he was in federal custody in Texas.

11   Upon my review, they don't have anything to do with this

12   incident.

13             MR. DJANGMAH:  Objection.

14             THE COURT:  You've got to stop with the objections.

15   This is not a trial.

16             MR. DJANGMAH:  I know.

17             THE COURT:  That's when you do the objections.

18             MR. DJANGMAH:  I know.

19             THE COURT:  Let him finish and then I'll let you

20   speak.

21             Mr. Beath, finish, and then Mr. Djangmah will speak.

22             MR. BEATH:  They appear to address treatment that he

23   received while he was in federal custody as a result of

24   incidents with federal correction officers.  So I think we

25   would oppose admission, but I'm not sure what his basis for

1   admission is.

2                  THE COURT:  Well, there's a couple of things.

3                  Mr. Djangmah, why do you wish to admit these

4   documents?  How do they relate to the injuries you believe

5   you received from the police on that night in December of

6   2007?

7                  MR. DJANGMAH:  Okay.  This is an actual factual

8   evidence of what occurred.  Because when they rushed me through

9   St. Barnabas, everything went so quick.  And within days I was

10  sent to Texas and that's where I received the actual treatment.

11  And this has a lot to do -- this is my main thing.  This has a

12  lot to do with this case.

13                 THE COURT:  How can it have a lot to do with this case

14  when it's dated 2008, almost a year after the incident in the

15  case?

16                 MR. DJANGMAH:  It was not a year after.  This happened

17  in 2007 and --

18                 THE COURT:  It happened in December of 2007.

19                 MR. COHEN:  -- I was in local custody over here, but

20  that time they send me over there while I was still going

21  through those pains and I had those injuries.  I was

22  examined by the federal authorities over there.  That's the

23  record I have over here, that I signed for, of where I've been

24  besides St. Barnabas.  And that was where my actual treatment

25  started from.

1      THE COURT:  Okay.  Mr. Djangmah, I'm going to ask the

2  question again:  When are those records dated?

3      MR. DJANGMAH:  9/3 of '08.

4      THE COURT:  That's September of 2008.

5      MR. DJANGMAH:  Yes.

6      THE COURT:  That is nine months after the incident

7  with the police.

8      MR. DJANGMAH:  It was before nine months.  It was from

9  the time-- I can give it to you too.

10      THE COURT:  Yes, please.

11      MR. DJANGMAH:  And I have more over there.  They have

12  it, as well.  If you look at the NYC 1552, it states here with

13  the date stamp and everything that I did receive the treatment

14  12/30 of 2008.

15      THE COURT:  12/30 of 2008 or 2007?

16      MR. DJANGMAH:  2007.  It was already close to

17  December, when this incident happened.  And they had me over

18  here for nearly two and a half, three weeks before they ship me

19  to Texas.

20      THE COURT:  Okay.  I'm sorry to make the parties wait,

21  but I'm going to make the parties wait for a moment.

22      (Pause)

23      MR. DJANGMAH:  All they did at St. Barnabas that night

24  was just treat me and just clean out the blood, staff take off

25  my shirt, and just send me to -- what do you call it?  Rikers

1   Island or wherever the boat is.  From there I was picked up

2   nearly a week and a half, while I was still in pain and going

3   through the injuries, and was sent to Texas right away.  I

4   actually went through Pennsylvania, York, before I got to

5   Texas, before I fully got all my treatment.  Started getting my

6   treatment from -- that is the main place that I actually

7   started getting treatment.

8              THE COURT:  I want a copy of these before the day

9   ends.

10             Mr. Beath, in these documents, from what he's saying,

11  according to the presenting complaint, which seems to be dated

12  September 3rd of 2008, is Mr. Djangmah is saying that he was

13  forcibly pushed to the ground and handcuffed, now hurts

14  everywhere.  I don't think he's talking about something that

15  happened in the detention facility.  I believe what he's doing

16  is recounting what happened in December.

17             Am I misunderstanding these records?

18             MR. BEATH:  I looked at those records earlier today,

19  your Honor.  It's my recollection that they say that he

20  complains that he was pushed to the ground the previous

21  night.

22             THE COURT:  Well --

23             MR. DJANGMAH:  No.

24             THE COURT:  I guess we'll both have to read them more

25  carefully.

1          I have a couple of questions that remain, and one

2     is --

3               MR. DJANGMAH:  Your Honor, there is something --

4               THE COURT:  Are you going to let me speak,

5     Mr. Djangmah?  Yes, you are.

6          I still have the issue that I was discussing with you

7     earlier:  Who is going to say what these records are?  Who are

8     you going to have that says that these are records of the

9     facility?  You did not prepare them.  You don't suggest that

10    you prepared them.  And certainly I suppose you'd be able to

11    say -- although I'm not sure that it's relevant -- that nine

12    months later you were still in pain and you were complaining

13    about it when you were in immigration custody.

14         But who do you have?  Because there's no one on your

15    witness list that can say that these documents are medical

16    records that Harlingen Medical Center keeps in the ordinary

17    course of business and are prepared as part of that business

18    and that they accurately reflect what was told to them on a

19    particular day.

20         That's the problem, sir.  These are the statements

21    of other people.  And they're your statements, but to the

22    extent they're your statements, the jury's going to have you

23    there to talk about it.

24         So how do you propose that these are coming in?

25              MR. DJANGMAH:  How do I propose?  This was ordered by

1  Judge Maas to go that day with Ms. Krasnow that day, to go into

2  every single hospital that I was throughout this -- what

3  happened and to authorize the release for my medical records.

4  All my medical records as a matter of fact.

5          THE COURT:  I understand that.  I'm not even disputing

6  that.  My question is a different one.

7          Having gotten those records-- and you can get those

8  records through the medical releases that you filed and through

9  the work that you did.  I get that.  But to get these to a

10  jury, you have to explain or you have to have someone who has

11  some knowledge of these documents explain to the jury the

12  circumstances under which they were prepared.

13          This is what I told you about half an hour ago.  You

14  can't just hand them a pile of documents and say, These

15  documents are what I say they are.  You have to have somebody

16  who has the ability to say what they are speak to them.  Here's

17  a for instance.  If somebody from Harlingen Medical Center got

18  on the stand and said, Hi, I'm the custodian of records for

19  Harlingen Medical Center.  I have looked at these documents.

20  These are documents that we maintain and we prepare in the

21  ordinary course of business and it is part of our business to

22  deal with these records.  Or you have someone who says that

23  these are, in fact, medical records that I prepared because I

24  was the nurse that night taking this information down.  That's

25  one thing.

 1          But I don't think these-- you can't just hand them in.

 2     So that's the problem.

 3          MR. DJANGMAH:  I didn't just hand them in, your Honor.

 4     This was ordered by the judge to for me to release --

 5          THE COURT:  Stop telling me that--

 6          MR. DJANGMAH:  I did not--

 7          THE COURT:  I get to talk.  Stop telling me that it

 8     was ordered by Judge Maas.  That does not make them admissible

 9     at trial.  I will tell you this repeatedly.  I'm not sure how

10     many times I have to tell you this.  I appreciate that he

11     ordered you to get these documents.  These documents were

12     gotten.  You complied with his order.

13          That's very different from saying that these are

14     authenticated and admissible under the Federal Rules of

15     Evidence.  That's what I'm saying.  I cannot be any clearer

16     with you, sir.  There are ways that these documents can come

17     in, but you can't just hand them to the jury, unless the

18     defendants agree that you can hand them to the jury --

19          MR. DJANGMAH:  It's in my summary judgment, Judge.

20          THE COURT:  That means nothing to me.

21          MR. DJANGMAH:  Okay.

22          THE COURT:  How were they authenticated for summary

23     judgment purposes?  Did you have someone talk about them in the

24     summary judgment motion or did you simply say these are the

25     documents that I got from Harlingen?  Because someone had to

1   authenticate them and someone had to make them admissible.

2          So I see them.  And when this conversation ends, you

3   can talk to Mr. Beath and Ms. Seligman and find out if they

4   will let these in, or if you can find someone in the next

5   couple of days to get them in.  I'm telling you that they are

6   not -- right here, right now, they're not admissible.  I'm

7   still going to make a copy of them because I don't know

8   why --

9          MR. DJANGMAH:  I object to that, Judge, because you

10  are asking my injury from the beginning, and the Court has been

11  asking my injury, they have been asking my injury.  They asked

12  me to sign a release form, which I did.  I didn't make this up.

13  It was a professional that made this up.  They're all in the

14  federal detention that I learned from the government.  I didn't

15  make this up.

16         THE COURT:  No one is--

17         MR. DJANGMAH:  It is not my-- it's my record.  I

18  didn't make it up.  I was examined and this is what they

19  observed.  And this is--

20         THE COURT:  All right.  Again, I'm going to ask you to

21  calm down and let me speak.

22         MR. DJANGMAH:  Okay.

23         THE COURT:  I'm not talking about-- I'm not suggesting

24  that they were made up.  I'm suggesting that when you have a

25  trial in federal court, that documents that are presented to

DC3BDJAC                    Conference

1    the jury have to be presented in certain ways.  You, sir, have

2    the ability to get on the stand and to tell the jurors that you

3    had, or you believe you had, a series of injuries.  And you can

4    talk about the injuries that you believe you suffered.  That's

5    fine.

6         If you had a treating physician that you wanted to

7    put on the stand, you should have told me about it, but you

8    could have put someone else on the stand and said, I examined

9    him on "X" date and on that date I found that he had these

10   injuries.

11        What I'm saying is that when it comes to documents,

12   because of the fact that documents are documents, there are

13   ways in which they can be admitted at trial and there are ways

14   that they can't be admitted at trial.  So all I'm asking you to

15   do is to pay attention to the Rules of Evidence and the rules

16   that govern how these things get admitted.  Your wanting them

17   to be admitted is not sufficient.

18        Talk to Mr. Beath and see if there is agreement on

19   these.  Otherwise, I don't believe that they are admissible at

20   trial.  I'm telling you I'm still going to look at them because

21   I want to see them --

22        MR. DJANGMAH:  They are factual facts.  This is

23   evidence.  This is what occurred.  This is evidence.  So why

24   wouldn't it be admitted in the records?  I don't understand.

25        THE COURT:  Because evidence has to be admissible in

DC3BDJAC                    Conference

1    order to be admitted.  And for the evidence to be admissible,

2    when it involves the statements of other people and the

3    opinions of other people, there are-- it implicates the hearsay

4    rules.  And there are rules that deal with that.  There are

5    rules that talk about the things that you can do to get

6    documents in.  But what you can't do is just throw the document

7    at the jury and say, Here, it's coming in.

8           So you may disagree with me, and that's fine, but

9    actually in this instance I know the rule of evidence that

10   applies to this.  So it's not enough to-- you're saying to me

11   it's factual.  Because it may be factual, you are allowed to

12   testify to the injuries that you believe you suffered.  But if

13   you're going to introduce documents, you ought to get the

14   person who put the documents together.  That's my point.  Or

15   someone within the hospital or within the facility who can say

16   these are our documents.  These should come in as business

17   records.  That's what I'm saying.

18          MR. DJANGMAH:  Okay.  So you're saying this is your

19   opinion.

20          THE COURT:  It is the proper --

21          MR. DJANGMAH:  You're saying it's the Rules of

22   Evidence that pertain to this.  If you can at least provide me

23   with the Rules of Evidence that pertain to this particular

24   matter.  When I have entered them already in my summary

25   judgment that now is not admissible during trial, it's what I

DC3BDJAC                              Conference

1    don't understand.

2            Second of all, I'd like to make a note for the record

3    that I was proceeding pro se.  I'm not a bar cardholder.  I

4    don't understand.  I was understanding and I'm still learning

5    as this case progresses.  So why am I being blamed when I have

6    done whatever I can to the best of my ability to put this

7    forward?  And now I'm being told last minute that my evidence,

8    my main evidence, is not going to be admitted in the record

9    before the jurors.

10           So that's what I'm asking you.  Is that your opinion?

11   And if it's not your opinion, then you tell me.  You're saying

12   that as a judge that these are the Rules of Evidence.  I would

13   like to know the Rules of Evidence so I can go and review them

14   and that's how I learn.  I learn every day, ma'am.

15           THE COURT:  Okay.

16           MR. DJANGMAH:  That's all I'm saying.

17           THE COURT:  All right.

18           MR. DJANGMAH:  So if you will provide me the law of

19   that, it's called this and that, that pertain to the Rules of

20   Evidence in this particular matter, I'll be more than happy to

21   accept that and I will take that as your opinion.

22           THE COURT:  All right.  The Rules of Evidence that you

23   wish to consider are Rules 401, 801, 803 and 804.

24           MR. DJANGMAH:  401, 803?

25           THE COURT:  801, 803 and 804.

1             MR. DJANGMAH:  803 and 804?

2             THE COURT:  Correct.

3             MR. DJANGMAH:  And what title or under which--

4             THE COURT:  They are in the Federal Rules of Evidence,

5     that's what they are called.  401 deals with relevance; 801

6     deals with hearsay; 803 and 804 are exceptions to the hearsay

7     rule.  And I think in particular-- my law clerk noted on page

8     NYC 1565 there are references to a presenting complaint in

9     which the EMS states "Pain to the head, face, hands, back and

10    legs after altercation last night."  However, these have been

11    crossed out.  So I can't say that those are --

12            MR. DJANGMAH:  There you go.

13            THE COURT:  I think the notation of the "altercation

14    last night" may have been in error because the only thing I see

15    on it is crossed out.

16            MR. BEATH:  Okay.

17            THE COURT:  But, Mr. Djangmah, I'm not going to

18    respond again, point by point, to everything that you've said.

19    I will simply note that there is a pro se office that is

20    affiliated with this district and other people in other cases I

21    have use it all the time.  And one of the things they do is

22    they check in to make sure that the evidence that they wish to

23    introduce is appropriately admitted at the trial.

24            There's not a question of blame here.  And there is--

25    I have done an awful lot to make sure you understand what's

DC3BDJAC                    Conference

going on in this case.  What I'm not prepared to do is to

totally cast aside the Rules of Evidence because then that's

not a fair trial and you don't want me to do that.

MR. DJANGMAH:  Definitely.

THE COURT:  So it is my opinion.  I also would

like more than the ten minutes I've had to look at these

documents.  But my concern for you when it comes to documents

is that if you haven't drafted them yourself, I think you want

to find someone who can say, yes, I drafted them, or this is

my business's records and this is what we do.  That is my

point.

Again, sir, in some cases the parties can agree to the

admission of certain documents.  The parties can agree that the

trial can be streamlined by not having to introduce certain

witnesses just to say, yes, these documents are authentic or,

yes, these documents are business records.  The point is I

don't think you've had these discussions with your adversary,

so I'm not going to order them to agree to these documents.

You have to talk to them.  And that's part of this.  So while I

understand that you are learning this case, I also understand

this case has been going on for five years.

Let me speak then about trial issues unless anyone has

evidentiary issues to raise.

MR. BEATH:  Your Honor, we do have a couple of issues

that we'd like to raise.

1          THE COURT:  All right.  I kind of feel like we had a

2     final pretrial conference in this, but, all right, go ahead.

3          MR. BEATH:  Just a couple of things.  One is a

4     concern, based on Mr. Djangmah's pretrial order and some of the

5     comments made last time, that he may try to cross-examine

6     Officer Falcione or introduce evidence of a shooting that

7     Officer Falcione was involved in after the incident that forms

8     the basis of this lawsuit.

9          It's our position that he should not be allowed to

10    inquire into that shooting whatsoever; that it's entirely

11    irrelevant and will prejudice the jury.  It's unduly

12    prejudicial and not at all probative in this case.

13         THE COURT:  I guess my initial reaction is that there

14    were in limine motions-- there were motions in this case about

15    what could and could not come in.  That's why we were dealing

16    with all these documents So Why was I not made aware of this at

17    our last conference or at any time prior to tonight?  Because

18    I'm thinking this is the first I'm hearing of it.

19         MR. BEATH:  In our motions in limine, we moved to

20    exclude evidence of prior CCRB or IEB complaints against

21    defendant Falcione.  That would include the shooting.  There

22    was an IEB investigation into that shooting.  And so that's

23    what I would say in response.

24         Further, plaintiff had not made explicit his intention

25    to bring in evidence of this shooting, but we wanted to ensure

 1   that it was addressed prior to trial.

 2              THE COURT:  All right.  Mr. Djangmah, you know at some

 3   point Officer Falcione, the defendant in this case, is going to

 4   testify.  Yes?  You're aware of that?

 5              MR. DJANGMAH:  Yes.

 6              THE COURT:  Do you intend to cross-examine him about a

 7   shooting that happened after your incident?

 8              MR. DJANGMAH:  Definitely.

 9              THE COURT:  On what basis were you going to

10   cross-examine?  How is that relevant to your case?

11              MR. DJANGMAH:  It's very relevant to see the pattern.

12   Since they want to bring my past in in cross-examining me as

13   well as --

14              THE COURT:  Wait.  Let me stop you right there.  How

15   are they bringing in your past in cross-examining you?

16              MR. DJANGMAH:  That is my assumption.

17              THE COURT:  Well, don't give me your assumption.  Give

18   me the facts.

19              MR. DJANGMAH:  Okay.

20              THE COURT:  So you're trying to meet them with

21   something when I haven't yet heard they're going to do that.

22              MR. DJANGMAH:  No.

23              THE COURT:  So why is the shooting relevant?

24              MR. DJANGMAH:  Why is the shooting not relevant when I

25   would have been the same victim that was killed?

1          THE COURT:  No, cut that out.  Try again and actually

2    give me an argument that doesn't-- I'm not the jury here.  I'm

3    actually the judge.  Tell me--

4          MR. DJANGMAH:  So why don't you let a jury decide

5    then?

6          THE COURT:  Because my job as the judge is to ensure

7    that appropriate evidence gets before the jury.  So I'm giving

8    you this opportunity to tell me why it is appropriate.  And you

9    giving me hyperbole about I could have been the one shot,

10   that's not useful.  Tell me why it is relevant.  Does it go to

11   his credibility?

12         MR. DJANGMAH:  Somewhat.

13         THE COURT:  How?

14         MR. DJANGMAH:  How?  To show why, since I was handled

15   with excessive force, to show why and how that does pertain to

16   this case.  Because it was the same excessive force with

17   respect to the one that was shot and killed by the family.  So

18   why am I not allowed to bring this before the jury?

19         THE COURT:  Well, Mr. Beath, again, this is the first

20   I'm hearing about the shooting.  So tell me about the shooting.

21   The answer is I'm not going to decide tonight.  I'm going to

22   have to see some file in camera, but if there is a CCRB-- there

23   must be something on this.

24         MR. BEATH:  There is news coverage.  There was an

25   internal affairs investigation into it.  There's an ongoing

DC3BDJAC                          Conference

1   civil lawsuit --

2           THE COURT:  Mr. Djangmah, stop sighing.  Stop

3   expressing disgust.  It is not productive.

4           Mr. Beath, please continue.

5           MR. BEATH:  There was news coverage.  There was an

6   internal affairs investigation that exonerated Officer Falcione

7   and there's a pending civil lawsuit in state court against

8   Officer Falcione concerning the shooting.

9           THE COURT:  All right.  What of this can I have and

10  how quickly can I have it?  What do you have that I can look

11  at?

12          MR. BEATH:  I can talk to my office and see if we can

13  get you a copy of at least the complaint in the pending civil

14  litigation.

15          THE COURT:  Is that here in this district?

16          MR. BEATH:  It's in state court, your Honor.  It is in

17  Manhattan, I believe.

18          THE COURT:  Okay.

19          MR. BEATH:  We can make an inquiry with internal

20  affairs and see if we can get a copy of their closing report of

21  the investigation.

22          THE COURT:  It's going to have to be very quickly.  I

23  mean, I think Mr. Djangmah has an argument -- I'm not sure how

24  far it goes -- that there is a suggestion of a pattern here.

25  Again, it's too much to say he would have been shot, but if

DC3BDJAC                    Conference

1    there is a substantiated allegation of excessive force, then he

2    should be -- and you're going to tell me it's not

3    substantiated.  I understand that.  But isn't that the

4    redirect, that he was completely exonerated?  And, therefore,

5    how does it prejudice him to have it discussed?

6           MR. BEATH:  It's our position that the shooting is

7    entirely different in nature to this incident here and that one

8    very much dissimilar incident can't possibly show a pattern.

9    Rather what Mr. Djangmah would effectively be using it for is

10   to show a propensity to use excessive force which is forbidden

11   under 404(b).

12          Additionally, because of the emotional nature of

13   shootings, it would-- I believe it caused somebody's death.  It

14   would prejudice the jury.  It risks them deciding this case

15   based on an emotional reaction to a shooting that is not

16   related to this case.  So it's our position that any inquiry

17   into that area should not be allowed.

18          THE COURT:  All right.  Well, I need to see this

19   material as soon as possible.

20          All right.  What else do the parties need to spring on

21   me at this last minute?

22          MR. BEATH:  Now that it's been confirmed that Ivan Eli

23   is testifying, your Honor, he has two prior convictions that we

24   intend to inquire into during his cross-examination:  One is a

25   2011 conviction for grand larceny as a result of credit card

1   fraud; the other is a 2002 conviction, again for grand larceny,

2   and forgery involving credit card fraud.  It's our position

3   that both of those convictions go to his credibility.

4            THE COURT:  All right.  So is this going to be under

5   609?

6            MR. BEATH:  It would be under 609, yes, your Honor.

7            THE COURT:  All right.  Mr. Djangmah, what they're

8   speaking to right now is the following:  We've been talking

9   earlier about the Federal Rules of Evidence --

10           MR. DJANGMAH:  Can I answer, please?  Can I answer

11  what he just said?  Because if I can't introduce the shooting

12  based on the credibility of the officer, why is he going to be

13  introducing the credibility of a grand larceny that just

14  happened with respect to my witness--

15           THE COURT:  All right.

16           MR. DJANGMAH:  -- in this trial?  It doesn't make

17  sense.  This is not fair.

18           THE COURT:  All right.  Again, you're going to have to

19  refrain from raising your voice at me --

20           MR. DJANGMAH:  Yeah, but this is getting emotional to

21  me right now.  I'm just human.

22           THE COURT:  You're human, but when you're in front of

23  me, you have to be professional and if you can't be--

24           MR. DJANGMAH:  I'm trying, your Honor.

25           THE COURT:  Well, if you can't be, I can easily deal

DC3BDJAC                          Conference

1    with that by tossing this case out, so just stop it right

2    there.

3              The reason for the difference in treatment -- and

4    you're going to listen to me because you asked the question --

5    is that Federal Rule of Evidence 609, and specifically-- yes,

6    609 speaks to allowing reference to criminal convictions where

7    the criminal conviction has an element of dishonesty.

8              Now, I don't know-- and Mr. Beath is going to have to

9    look into this-- whether grand larceny has what is known as a

10   crimin falsi element.  And the point is where someone has a

11   conviction that has an element of falsehood or trickery or

12   fraud in it, the jury is allowed to know about that conviction.

13   Because the belief is that an individual who has convictions

14   that are based on fraud may be lying to the jury, and so the

15   jury is allowed to know that.

16             The difference here in treatment-- and, again,

17   realize that I have not decided what to do with respect to

18   Officer Falcione's shooting incident-- there is no conviction

19   in that case.  Rule 609 speaks of-- it's actually titled

20   "Impeachment by evidence of a criminal conviction."  That is

21   the way in which it is to be done.

22             Now, sir, you may decide, now that you're aware that

23   they have this ability to do this, that you may not want to put

24   Mr. Eli on the stand because you may not want him to be

25   cross-examined on these things.  Perhaps Mr. Chambers has a

DC3BDJAC                        Conference

1    different criminal record.  Perhaps he has a criminal record

2    that has convictions that don't involve crimes of falsehood.

3    Don't know.  But what I'm saying is, it's not a certainty, but

4    there is a chance that they will be allowed to do it because

5    the rule allows the introduction of criminal convictions, not

6    just bad acts.

7            The rule that Mr. Beath was talking about earlier

8    with respect to you, there are two of them, sir, one of them

9    is called Federal Rule of Evidence 404(b), and that speaks

10   about introducing other acts.  And the thing that you need to

11   know about that rule is that it says that you can't introduce

12   those acts just to show a propensity, just to show that

13   because someone did a bad thing a long time ago or more

14   recently, that they're going to do it again.

15           But there are circumstances under which you can admit

16   the act.  For instance, if it goes to the intent, if it shows a

17   method or an MO of a person, if it shows the absence of a

18   mistake.  I'm not sure that's what's being shown by the

19   shooting incident here, but I'm telling you there are reasons

20   or bases under Rule 404(b) that allow this evidence to be

21   admitted.

22           There is then a second level of inquiry.  There is a

23   rule called 403.  And that is a rule that says that the

24   evidence, if it is too prejudicial, if it's going to distract

25   the jury from the real issue in the case, that it would not be

1    admissible.

2            Sir, let me give you an example of that.  If, for

3    example, Mr. Beath were to say that he wanted to introduce

4    evidence of some-- I don't know what the horrible thing in your

5    past is, but if he did, it may be the case that I would say to

6    him, You can't introduce that piece of evidence because it's so

7    inflammatory, it's so prejudicial that the jury's not going to

8    be able to see straight.  They're not going to be able to look

9    at the claims.  They're going to get distracted on this other

10   issue.  So that's the issue.

11           With respect to these criminal convictions, there is

12   actually case law in the false and fraudulent crime context

13   that says I don't have a choice.  I don't have the ability to

14   keep this stuff out.  If it meets the qualifications of Rule

15   609, it comes in.

16           Now, it comes in, sir, in a very limited capacity.

17   What you can talk about is the date of the conviction, the

18   nature of the offense, what the title of the offense was

19   called, and what the penalty was that was imposed.  But you

20   don't get to talk about the specifics of the offense, you don't

21   get to talk about, well, it happened here and this is what--

22   no.  You say he has a conviction for grand larceny in 2011 for

23   which he received a suspended sentence or whatever it is.

24   That's the totality of the discussion.  Because, again, you

25   don't want the focus to be on that, but the law permits you to

 1   ask questions about it.

 2              MR. DJANGMAH:  So you're saying that it's okay to have

 3   the counselor introduce this conviction of Eli Ivan, which is

 4   my witness, into the record, which has nothing to do with my

 5   case, totally has nothing to do with my case, but not with

 6   respect to a shooting that is similar in nature to my case?  Is

 7   that what you're saying?

 8              THE COURT:  What I am saying, sir, is that there is a

 9   rule of evidence that allows an adversary to cross-examine a

10   witness with reference to that witness's criminal conviction if

11   the criminal conviction happened within a particular period of

12   time or if it involved a crime of falsity.  That is what I'm

13   saying.

14              I am saying, again, that I haven't decided what to do

15   with respect to the shooting incident; that it may be the case

16   that it is relevant to your case or it may be the case that it

17   should not be admitted pursuant to either 404(b) and 403.  I'm

18   telling you I don't have the information.  It is easier for me

19   to speak to the request that they have made because there is a

20   conviction.  Yours is not a conviction.

21              MR. DJANGMAH:  Okay.  And, again, in that case that

22   means that even though both of my witnesses are in federal

23   custody right now, they have been supposedly convicted, that is

24   going to go against my credibility because of this case that

25   Officer Falcione was exonerated in that case with CCRB, just

DC3BDJAC                    Conference

1    like in my case with the CCRB, is what I'm raising right now,

2    is the question I'm raising right now.  Because he is a cop.

3    He was exonerated by his own people.  And apparently this is a

4    private individual, private citizen, that did something

5    supposedly and he's also whatever he took and he also got

6    convicted and he's doing his sentence.  So that means that both

7    of my witnesses are not credible to the jury then.

8              THE COURT:  I'm not saying that.  I'm saying that it

9    depends on what their criminal convictions are, if there are

10   criminal convictions.  I don't know what Mr. Chambers is in

11   for.  I don't know that he's been convicted of anything.  There

12   may be nothing to cross-examine him on.

13             And I think you should consider, sir, if you've got

14   extra clothes at home, you should consider bringing a change of

15   clothes for these witnesses so that it's not obvious that they

16   are in federal custody.  I don't know what can be done, but I

17   think--

18             MR. DJANGMAH:  I don't understand that.

19             THE COURT:  Okay.  How do you think he's going to--

20   Mr. Eli or Ivan, is going to appear here in his prison garb,

21   sir.  Correct?

22             MR. DJANGMAH:  I'm not sure.

23             THE COURT:  Well, I don't know that he has any other

24   clothes with him in custody.  They don't pack a suitcase when

25   you go.  So if the question is -- if you have a concern, that

1   his testifying in prison garb causes you concern, then go out

2   and find him some clothes.  That's what I'm saying.  You may

3   want to have him wear clothes that are not prison garb so that

4   it's not obvious.  Again, that's an issue that I guess should

5   be addressed.  I'm not sure--

6           MR. DJANGMAH:  I'm sure there's -- what do you call

7   it?  We have-- I been there.  We have a change of clothes that

8   if he's coming to testify, obviously he's not going to be in

9   his prison clothes.

10          THE COURT:  Well, don't say obviously not, because I

11  think he will be unless you arrange for him to have other

12  clothes.

13          MR. DJANGMAH:  I'll arrange for him to have other

14  clothes if I have time.  And if you can order that, I can go

15  see him and see his measurements and I can send it to him.

16          THE COURT:  Okay.

17          MR. DJANGMAH:  That's no problem.

18          THE COURT:  But in response to your issue, Mr. Beath,

19  you haven't said anything with respect to Mr. Chambers.

20          Are you about to make a similar application with

21  respect to Mr. Chambers?

22          MR. BEATH:  Today is the first time that we're hearing

23  that he may testify.  So I don't know that he has any

24  convictions, but we can look at that promptly and let your

25  Honor know within the next 24 hours whether we intend to

1    cross-examine him on any prior convictions.

2                    MR. DJANGMAH:  I'm sure he does.  Just letting you

3    know.

4                    THE COURT:  Well, sir, he may have prior convictions,

5    but, as I explained to you earlier, not all prior convictions

6    are appropriate topics of cross-examination.  So if he has a

7    prior conviction for, I don't know, being a deadbeat dad, I'm

8    not sure that comes in-- I'm just thinking.  I don't that comes

9    in because I don't think it involves the crime of falsity.  And

10   I think the other thing is it would depend on the timing.

11                   And, sir, it doesn't go to your credibility at all.

12   You're not the individual with the prior convictions.  It goes

13   to theirs.  So you said earlier these witnesses go to my

14   credibility.  It's going to their credibility.

15                   MR. DJANGMAH:  But they're testifying on my behalf.

16                   THE COURT:  Yes.

17                   MR. DJANGMAH:  So what the defense is trying to do is

18   break my credibility as far as, you know -- let the jury not

19   believe that because of the fact that he was convicted, that

20   means that he didn't see what happened or what he's saying is a

21   lie on the stand.

22                   THE COURT:  All right.  Well --

23                   MR. DJANGMAH:  So it has a lot to do with my

24   credibility as well.

25                   THE COURT:  Well, sir, you now know that they're going

1    to make the application.  You now know what the two offenses

2    are --

3              MR. DJANGMAH:  I'm objecting to that application.

4              THE COURT:  I understand that.  But if I let it in,

5    then you're going to have to decide whether you still want him

6    to testify.  If you do, you do.  That's fine.

7              MR. DJANGMAH:  Sure.

8              THE COURT:  But I'm telling you that other folks may

9    decide -- and it would be fine if they decided this way -- that

10   it wasn't worth it for their witness to be subject to that kind

11   of cross-examination.  Their witness's testimony was not so

12   important to their case that they needed to have it.  So I

13   leave that to you.  You have the option to not call Mr. Ivan,

14   Mr. Eli, as a witness and you have the option to call him as a

15   witness knowing what may happen.

16             Again, Mr. Beath, you're going to be sending to me,

17   perhaps, certificates of conviction with respect to

18   Mr. Ivan?

19             MR. BEATH:  Yes, we'll send you documentation of the

20   convictions, your Honor.

21             THE COURT:  Very soon, because I'll look at it

22   tomorrow and make the decision tomorrow.

23             MR. BEATH:  Yes.

24             THE COURT:  All right.  Are there any other

25   evidentiary-- oh, Mr. Beath, another evidentiary issue?

1          MR. BEATH:  This is very simple, your Honor.  Just

2     concerning the documentation that Mr. Djangmah has provided to

3     the Court this evening regarding Newbridge records.  We have

4     not seen that documentation.  You indicated it's a fax from May

5     of this year.  If it's at all possible for us to receive a copy

6     of that so we can evaluate it as well, I would be very

7     appreciative.

8          THE COURT:  All right.  We'll make two copies.

9     There'll be two copies made.  I'll make a copy set for you and

10    we'll also make a copy of the Harlingen forms.

11         Do you have these?

12         MR. BEATH:  We have a copy of Harlingen.  They are

13    Bates numbered, right?

14         THE COURT:  They are Bates numbered NYC 1561 to NYC--

15    that can't be right.  It's in reverse order.  Excuse me.

16         MR. BEATH:  Yes.  If I may, your Honor, I think that

17    the September records were Bates stamped later than the

18    December records.

19         THE COURT:  Right.  I've got beginning with 1545 and

20    the latest one I have is 1572.

21         MR. BEATH:  Okay.

22         THE COURT:  All right.  Any other evidentiary issues?

23         MR. BEATH:  No, your Honor.

24         THE COURT:  Mr. Djangmah.

25         MR. DJANGMAH:  Having said that, I'd like to let the

DC3BDJAC                        Conference

 1  record reflect that based on what occurred -- first of all, I'd

 2  like to know the lady's name behind me.

 3          THE COURT:  Yes.  She introduced herself to me as

 4  Rachel Seligman when the matter began, but if you want her to

 5  introduce herself to you now --

 6          MR. DJANGMAH:  I'd like to get the full name.

 7          THE COURT:  Okay.  Do you want her to provide it now?

 8          MR. DJANGMAH:  Sure, no problem.

 9          THE COURT:  Ms. Seligman, please.

10          MS. SELIGMAN:  Good afternoon, Mr. Djangmah.  My name

11  is Rachel Seligman.  I also work at the Law Department with

12  Mr. Beath.

13          MR. DJANGMAH:  Could you spell your last name?

14          THE COURT:  Ms. Seligman, could you spell your last

15  name?

16          MS. SELIGMAN:  Sure.  S-e-l-i-g-m-a-n.

17          MR. DJANGMAH:  Rachel?

18          MS. SELIGMAN:  I don't have a card with me.

19  Otherwise, I'd give it to you as well.

20          MR. DJANGMAH:  My second question, and probably that

21  will be my last question, that I will be also requesting before

22  trial both of them for their legislative authority to take this

23  case as well.

24          THE COURT:  I want to make sure I understand what

25  you're saying.  Are you saying what is their authority to

DC3BDJAC                          Conference

1    represent Officer Falcione?

2              MR. DJANGMAH:  Exactly.  The legislative authority to

3    represent this defendant.  Yes, I'm requesting that.

4              THE COURT:  All right.  Mr. Beath, if you can speak to

5    the issue at this time, please do so.

6              MR. BEATH:  Yes.  Under General Municipal Law, Section

7    50K, the New York City Law Department, the Office of the

8    Corporation Counsel for the City of New York, has the authority

9    to represent the City of New York any time the City is sued in

10   civil litigation.

11             We also have the authority to represent any individual

12   employees of the City of New York who are sued because of

13   actions taken within the scope of their duties in their

14   employment for the City of New York.

15             It's in that capacity that we represent Defendant

16   Falcione.

17             MR. DJANGMAH:  It's a municipal law, not a federal

18   case.

19             THE COURT:  He said to you it's New York State's

20   General Municipal Law, Section 50K?

21             MR. BEATH:  Correct.

22             MR. COHEN:  That doesn't apply.  This is a federal

23   court.  They have to go through the Attorney General and had to

24   make application through the Attorney General.  That I know for

25   a fact.  So I'm asking -- I'm requesting the authority to take

 1   this case to begin with.

 2               THE COURT:  All right.  Well --

 3               MR. DJANGMAH:  And the oath of office is mainly what

 4   I'm requesting.  Also the -- what gives them the authority to

 5   take this case.  Because there's been-- I'm confused.  From

 6   Catherine Smith to Elizabeth Krasnow to Ms. Rachel to -- I

 7   don't know.  So I'm requesting that for the record.

 8               THE COURT:  All right.  Well, let's begin at the

 9   beginning.  This case is brought in federal court.

10               MR. DJANGMAH:  It's a federal court case.

11               THE COURT:  Yes.  You have brought it against a member

12   of the New York City Police Department.  Agreed?  We're in

13   agreement so far?  Yes?  Officer Falcione is, or was at the

14   time of the incidents that you describe in your complaint,

15   employed as a member of the New York City Police Department.

16   Correct?

17               MR. DJANGMAH:  Yes.

18               THE COURT:  Yes.  The New York City Police Department

19   cannot itself be sued because I believe there is a charter that

20   provides that if someone screws up and they work for the New

21   York City Police Department, the entity that gets sued is the

22   City of New York.

23               Do you want me to give you a cite for that or do you

24   agree?  I'm telling you this because I know it from other

25   cases.  If you need a cite, well, we'll have to get that for

DC3BDJAC                    Conference

1    you some other time.  I'm telling you that you are not able to

2    sue the New York City Police Department because they are a part

3    of the City of New York.  So if your complaint is against a

4    member --

5           MR. DJANGMAH:  So you're saying they're part of the

6    government.

7           THE COURT:  Yes, I'm saying that the New York City

8    Police Department is a part of the City of New York and they

9    have an agreement.

10          And, Mr. Beath, is it a charter?  Is it a provision of

11   the --

12          MR. TOWNSEND:  I believe it's a provision of the city

13   charter which specifies that an agency of the City of New York

14   cannot be sued; that the suit is properly brought against the

15   City of New York itself.

16          THE COURT:  Right.  Sir, let me give you another

17   example.  I have a case that is brought against New York City's

18   Department of Homeless Services.  They cannot be sued

19   themselves; instead you sue the City of New York and that's the

20   party in suit.

21          So right now you have sued a person who works for the

22   New York City Police Department and, therefore, by extension

23   you are suing a person who works for the City of New York.

24          You with me so far?

25          MR. DJANGMAH:  I'm confused.

1     THE COURT:  Well, tell me -- I'm not going to spend

2     all night doing this, but I'm working with you to help you with

3     your confusion.

4     MR. DJANGMAH:  I'm trying to understand what you're

5     saying, but it's not from my understanding of what I have read

6     from the law itself.

7     THE COURT:  And I'm not sure what you're talking

8     about.  Sir, I agree that there are certain instances -- for

9     example, prosecuting cases -- where folks who work for the City

10     of New York don't have the ability to prosecute cases on behalf

11     of the federal government.  They would have to be deputized by

12     the federal government.

13     That's not what we're talking about here.  Your

14     question is, what gives them the right to represent a city

15     employee?  Am I correct?  That's your question?

16     MR. DJANGMAH:  That's correct.

17     THE COURT:  Okay.  What gives them the right is a

18     provision of New York State's General Municipal Law that says

19     that in instances in which a city employee is on the hook, a

20     city employee is a party in a lawsuit, the Law Department,

21     sometimes known as the Office of Corporation Counsel -- and

22     that is the entity that employees both of the folks behind

23     you -- they are the ones who step in to represent the City.

24     It does not violate federal law, there's no federal

25     state issue, because there are no federal folks who are

DC3BDJAC                          Conference

 1   representing the City of New York.  The federal folks would

 2   represent, if you will, the FBI, the Department of Homeland

 3   Security.  Those folks would have federal representation.  But

 4   your lawsuit is against a city employee and, therefore, the

 5   entity, the Law Department, whose job it is to represent the

 6   City, represents the employees of the City.

 7            MR. DJANGMAH:  So you're saying that Officer Falcione

 8   is not a public official?

 9            THE COURT:  No, I'm not saying that.  I'm saying

10   Officer Falcione is, in fact, a public official.  He is a

11   member of the New York City Police Department.  What I'm

12   saying, sir -- I'm sorry if you don't want to believe it, but

13   it is, indeed, true.

14            MR. DJANGMAH:  I don't understand.

15            THE COURT:  Well, I don't know what there is to

16   understand.  If Officer Falcione were, in fact, Special Agent

17   Falcione of the FBI, it would be a different issue.  The people

18   who would have to represent him would be the United States

19   Attorney's Office, the federal attorneys for this district, the

20   district that includes the City of New York.

21            That's not what your case is.  Your case is against a

22   city employee.  The job of Mr. Beath and Ms. Seligman and

23   Ms. Smith and Ms. Krasnow is to represent employees of the

24   City of New York.  That's why it is appropriate for them to be

25   here.

1          And, sir, I'm just going to tell you -- I do have to

2     say this because I have to say this:  We're five years into

3     this litigation.  It's too late for you to be telling me I

4     have the wrong people at the back table.  I know for a fact

5     that I have the right people at the back table.  And I'm trying

6     to --

7          MR. DJANGMAH:  So from the law, the case that you

8     cited, you're emphasizing that they are employees-- they are

9     counsel for --

10          THE COURT:  For the City employees.

11          MR. DJANGMAH:  For the city, not for the federal.

12          THE COURT:  That's correct.

13          MR. DJANGMAH:  City, not for federal.

14          THE COURT:  That's correct.

15          MR. DJANGMAH:  But this is a federal case, Judge.

16          THE COURT:  It's a federal case against a city

17     employee.  That's the mistake that you're making.  You have

18     brought a case in federal court.  Everybody agrees with you on

19     that.  But the case you have brought is against a city

20     employee.  That's why they're at the back table.  And--

21          MR. DJANGMAH:  So --

22          THE COURT:  Let me just finish.  If you had brought a

23     state case against Officer Falcione, they'd still be at the

24     back table.  If you had brought a case in another state against

25     Officer Falcione, they'd still be at the back table.  It

1  doesn't matter.  What matters is the person that you have named

2  as a defendant, that person, Officer Falcione, is a city

3  employee and that's why they're there.

4          MR. DJANGMAH:  So, in other words, they are what?

5  They are bar holder attorneys or they are lawyers?

6          THE COURT:  They are?  I didn't hear the first word.

7          MR. DJANGMAH:  Whether they are bar holders or they

8  are lawyers.  Are they attorneys or are they lawyers, is what

9  I'd like to clarify right now?

10         THE COURT:  What's the difference, sir?

11         MR. DJANGMAH:  There's a big difference.

12         THE COURT:  Not to me.  What's the difference between

13 an attorney and a lawyer?  In this country what's the

14 difference?

15         MR. DJANGMAH:  There's a big difference.  There's a

16 different between a lawyer and an attorney, is my

17 understanding.

18         THE COURT:  Tell me what your --

19         MR. DJANGMAH:  By my research.  Because 1789 is when

20 Congress and the -- it's in the Attorney General's manual.  I'm

21 still going through it and it states that --

22         THE COURT:  Are you going through the Attorney

23 General's manual or the United States Attorneys' Manual.

24         MR. DJANGMAH:  United States Attorney General's

25 Manual.

DC3BDJAC                    Conference

| | |
|---|---|
| 1 | THE COURT:  Okay.  Those are two different things. |
| 2 | There's an Attorney General's publication and there's a United |
| 3 | States Attorneys' Manual.  Neither one of those applies here. |
| 4 | You're not suing-- this is not a case involving the United |
| 5 | States Attorney's Office.  It's a case involving the City of |
| 6 | New York. |
| 7 | MR. DJANGMAH:  I understand that. |
| 8 | THE COURT:  All right.  And with respect to your other |
| 9 | question, in this courthouse, in I think most contexts, |
| 10 | "attorney" and "lawyer" mean the same thing.  There are |
| 11 | individuals who are appointed as attorneys-in-fact for certain |
| 12 | purposes.  Not really here.  I think of them more with wills |
| 13 | and real estate closings and things of that nature. |
| 14 | MR. DJANGMAH:  I can send you a case law and the |
| 15 | cite from the attorneys-- from the United States Attorneys' |
| 16 | Manual where it clarified the difference between an attorney |
| 17 | and a lawyer. |
| 18 | THE COURT:  All right.  But here today they have law |
| 19 | degrees. |
| 20 | Counsel, you each have law degrees? |
| 21 | MS. SELIGMAN:  I do. |
| 22 | MR. BEATH:  Yes, your Honor. |
| 23 | THE COURT:  Are you admitted to the bar of the State |
| 24 | of New York. |
| 25 | MR. BEATH:  Yes. |

DC3BDJAC                    Conference

1          MS. SELIGMAN:  Yes, your Honor.

2          THE COURT:  Are you admitted to the bar of the

3   Southern District of New York?

4          MR. BEATH:  Yes, your Honor.

5          MS. SELIGMAN:  Yes.

6          THE COURT:  They can be here.

7          MR. DJANGMAH:  Okay.  So I'd like to see the

8   legislative authority, you know, in black and white paper that

9   says that's what they're saying.  It's the same as hearsay.  I

10  don't know.  Can I see something on documentation?

11         THE COURT:  No.

12         MR. DJANGMAH:  Okay.

13         THE COURT:  Not five years into this case.  You could

14  have asked that questions years ago.

15         MR. DJANGMAH:  I don't think that it's late.

16         THE COURT:  No, it is late and you're playing games.

17         MR. DJANGMAH:  I'm a pro se litigant and I'm learning

18  as it goes.  It's not late.  We're still in the process of

19  going through this case.  But if that's what you say, I'll take

20  that as an advisement.

21         THE COURT:  You will have to do that because they have

22  obligations to me -- as do you, sir -- that when they make

23  representations in open court in response to questions that

24  I've asked them, they have an obligation to be honest or they

25  will have severe problems, not merely with respect to federal

1    criminal law, but with respect to their respective states in

2    which they are admitted to the bar.

3           So I have no reason, and you have shown me no reason,

4    to disbelieve them when they tell me that they are admitted to

5    the bar of the State of New York and admitted to the bar of the

6    Southern District of New York.  So I don't know why, having

7    asked them those questions and having had them make

8    representations to me as officers of the court, I don't think I

9    have to ask for further documentation.

10          MR. DJANGMAH:  I'm asking.  I think I'm required to

11   or --

12          THE COURT:  Mr. Djangmah.

13          MR. DJANGMAH:  That is the opinion.  I don't know

14   that-- no defense on what you say.  This is hearsay and this is

15   hearsay.  You want the facts.  You want proof.  Same as what

16   I'm asking.  I'm not asking for anything more than-- and you

17   brought up a very interesting topic here with respect to what

18   am I going to say.  That is it all right, since they are

19   supposedly an attorney, that they are supposed to be here to

20   represent this guy?  Will they be okay if I have to bring in

21   somebody from the outside that is not a bar cardholder to come

22   and be my counsel or assist me in this matter as well?  Would

23   that be okay then?

24          Because Congress says that anybody can practice law.

25   It says it in the books.  I didn't write that.  I'm reading

1   from what was written, from the same bar association.  You were

2   an attorney before a judge.  You know what I'm talking about.

3   You understand what I'm talking about.

4          So, I mean, I'm trying to get this fair.  Let's be

5   fair as possible.  You know, will that be okay?  Because I can

6   get somebody here to assist me, as well, that could be sitting

7   here right now, you know, that is not a bar cardholder, who is

8   eligible to practice law in the courtroom, in any courtroom in

9   America, to represent me as well or to assist me in these

10  proceedings.

11         THE COURT:  All right.  Earlier we talked about the

12  fact that evidence includes both testimonial evidence and

13  documentary evidence.  In effect, your adversaries have given

14  me testimonial evidence that they are attorneys.  I'm not going

15  to ask them for more.  I'm not.

16         Now, I want to understand what you've just said.  Are

17  you suggesting, sir, that sometime between now and Monday

18  you're going to get counsel to assist you in this case?

19         MR. DJANGMAH:  Maybe.

20         THE COURT:  Well --

21         MR. DJANGMAH:  Maybe.  I'll have somebody right next

22  to me during trial, to come in on the day of trial to come in

23  and represent me, because I have a few people --

24         THE COURT:  No, you don't.  You've been here pro se

25  all along.  If you're going to have counsel, you're going to

DC3BDJAC                    Conference

1    make an application to me for counsel, and I'll grant it or not

2    as I see fit.  But you don't get to just show up on the day of

3    trial and say, Oh, for five years I've been going pro se, but

4    today I've decided that I'm going to be represented.  You don't

5    get to do that.  I'm not sure why you think the rules don't

6    apply to you, Mr. Djangmah.

7              MR. DJANGMAH:  I follow rules very well.  And if

8    that's the case, then Ms. Rachel is here today and it's less

9    than a week to trial.  Where is the application?  I've not seen

10   anything before me that she has applied to the Court that she

11   will be on the bench during my trial.

12             How is that fair, Judge?

13             THE COURT:  Are you objecting to her participating in

14   the trial?

15             MR. DJANGMAH:  I'm not objecting, but what I'm

16   saying --

17             THE COURT:  Well, then that's it.  That's the answer.

18   Then she's in.  She's made an appearance.  You have no

19   objection.

20             MR. DJANGMAH:  Then I'll withdraw --

21             THE COURT:  No.  I'm tired of playing games with you.

22             MR. DJANGMAH:  I'm not playing games, Judge.

23             THE COURT:  You are right now.

24             MR. DJANGMAH:  No, I'm not, Judge.  I'm not playing

25   games.  I'm very serious.  I'm not playing games.  This is my

1   life here.  This is my life.  You have to understand that this

2   is my life.

3            THE COURT:  I do.

4            MR. DJANGMAH:  I don't sleep at night.  And if I have

5   to bring tons of people other than who are on the record of

6   what I did and they can testify that when I close my eyes for a

7   couple of hours and I'm supposedly sleeping, what goes on

8   behind or what they see and what they hear.  This is my life,

9   Judge.

10           THE COURT:  All right.  Are you --

11           MR. DJANGMAH:  I'm not going to let this Court reroute

12   me anymore. This is my life.

13           THE COURT:  I'm sorry, what did you just say?

14           MR. DJANGMAH:  I said I'm not going to let this Court

15   proceeding reroute me.  Please, with all due respect.

16           THE COURT:  No, it's not, Mr. Djangmah --

17           MR. DJANGMAH:  I'm not going--

18           THE COURT:  Stop right now.  Mr. Djangmah, you just

19   began by saying-- or you said "with all due respect."  You've

20   treated me with no respect this afternoon and I'm tired of it.

21   I have indulged many of your whims.  I have talked to you for

22   hours about all of the things that you need to know.  For

23   whatever reason you have not availed yourself of the services

24   of the pro se office and instead I have spent hours at each of

25   these conferences talking to you about what this trial is

DC3BDJAC                    Conference

1   about.  And despite the fact that I could stop right now, I'm

2   actually going to proceed to what's going to happen at this

3   trial.

4          If you are deciding now, at this eleventh hour, to

5   bring in counsel, you better let me know within the next day

6   because I will consider that, but I don't have to let someone

7   sit with you at trial.  I don't.  You have your right to a fair

8   trial.  I have my right to a fair trial.  And I have the right

9   to have an orderly courtroom.  And for you to spring things on

10  me at this last minute is not helpful.

11         So I will listen to you, but we've now spent 15

12  minutes discussing  the ability or the appropriateness of

13  having representatives of the Law Department defend a member

14  of the City.  It is appropriate.  You may not like it, but I

15  have explained to you and I've even given you citations to the

16  law.  So let's move on to the trial because that's the next

17  issue for us.

18         I have sent you, I've given to you both my proposed

19  voir dire questions.  If not, you're going to get them very

20  soon.  You do not need to look at them at the moment.  Take the

21  day to look at them.  If there are things you've given to me

22  and I haven't included them, it is because I have included them

23  in other forms.

24         Mr. Djangmah, you did not give anything to me, but I

25  am giving this to you now so that if there are questions that

DC3BDJAC                    Conference

may be appropriate, I'm giving you the opportunity to tell me

what those are.  So take the time, look at that, and see if

there are questions that you think are not being asked --

          MR. DJANGMAH:  Now?

          THE COURT:  No, you can do it after this conference.

I've said to both sides that we will get the jury charge out,

again by Thursday.  And so if you come to me with issues,

you'll come to me with issues on that.  I would rather know

earlier than later what's going to happen, but I do want to

make sure the parties are aware of what my inclination is with

respect to the charge.

          Openings in this case.  After the jury is selected,

there are going to be opening statements.  My expectation is

that the parties-- I don't think the openings are going to be

more than about 15 minutes per side.

          Mr. Djangmah, do you think -- first of all, do you

want me to talk to you about what an opening statement is?

          MR. DJANGMAH:  I think I have an idea about it, but I

just want to find out, during the selection of the jurors,

where would I be and what involvement would I have with respect

to that matter?

          THE COURT:  All right.  You'll be sitting where you

are right now.  The questions that would be posed to the jurors

are the questions on the list that I've just given you.  So I

think they do cover a lot of issues.  They cover issues

1    including any relationships that the jurors may have that would

2    influence their decision, the knowledge that the jurors may

3    have of certain people or certain places that might cause them

4    not to be fair jurors; any medical issues or hearing issues or

5    mental issues that they may have that might cause them unfit to

6    be jurors.

7            I ask the questions.  I have asked from both sides for

8    input in the questions that I have posed.  But the questions

9    that you have in front of you are ones that are very regularly

10   given in this district.  So they're not being made up out of

11   whole cloth.  They've been decided -- or they've been sort of

12   derived and used over a number of years.

13           But you should have them so that you can look at them

14   because come Monday morning, I will be handing to the jurors

15   something that looks like that.  And, therefore, if there's

16   something that is in there and should not be, because, for

17   example, maybe I'm addressing another case or I'm raising an

18   issue that doesn't need to be raised, you'll tell me.  If

19   there's something that's glaringly missing, I'll listen to that

20   as well.  But that's what's there.

21           Now, again, the next step is openings.

22           Mr. Djangmah, do you think you can get your opening

23   statement in in about 15 minutes?

24           MR. DJANGMAH:  No.  I would like to go back to the

25   thing with this jury stuff.  I'd like to know since you have

DC3BDJAC                    Conference

drafted your own questions, are you going to be asking the

jury-- are they going to be the same ones selecting a jury on

my behalf?

            THE COURT:  No.  First of all, those are questions

I've offered and in part I've offered them because you have

given me nothing else.  With respect to the selection of the

jury, those are the questions that are asked.  If the jurors

answer yes to those questions, then, depending on other

questions, I may call you and counsel in the back to the side

and say, Do you think that this juror should be stricken for

cause?  And what that means, sir, is that there is something

fundamentally wrong with having this juror sit on the jury.

            I will give you a for instance.  Let's say that

someone on the jury is a New York City police officer.  If that

person is, I would understand it, sir, if you came to me and

said, That juror should not sit on this jury because as a

police officer, he or she would not be or could not be fair in

addressing my claims.  And depending on how things played out,

I would probably -- probably; I'm not going to say for sure --

but I would likely strike that person from the jury.  But if

someone says to me, I have a cousin that I never see who's a

police officer and I never talk to them about their job, and

there's nothing about that person being a police officer that

would influence me, then I might not strike the person.

            So what happens, sir, is that when you ask questions

1    of this type, jurors sometimes identify themselves.  Some

2    jurors have said to me that they're not proficient in the

3    English language and, therefore, sitting through a trial at

4    which people are speaking to them in English is extremely

5    difficult.  And for that person you can't have them on a jury

6    because they won't understand what's going on.

7            When we've asked all of those questions and we've

8    found the jurors that just can't, can't, sit on this jury, then

9    you and your adversaries each get-- there will be about 14

10   people left of this group.  Of those 14 people, you get to pick

11   three.  And as long as it's not for an impermissible reason,

12   such as you don't want any person who's Asian on the jury or

13   you don't want any women on the jury, which you're not going to

14   do, but if there's someone on the jury and you say, you know,

15   that person, I just don't want them on the jury.  I don't know

16   why, but I don't want them on the jury.  Then you can say to

17   me:  I strike this juror.

18           You get three people from the jury that you don't--

19   you can't use an unconstitutional reason, like race or gender

20   or something of that nature, but if there's some other

21   reason -- if you say to me, I don't want any doctors on the

22   jury, and if there's a person on the jury who's a doctor, I

23   want that person off the jury, then I would listen to you.

24   That not being an unconstitutional basis, I would say, okay,

25   that person can go.

1          And Then Mr. Beath and Ms. Seligman, they will get to

2    say I don't want this person on the jury.  So you each have

3    three people that you can strike; not for cause, but just

4    because you have that ability.  When you do that, then we're

5    left with a jury of eight people, and those eight people sit

6    and they hear the case.

7          Do you understand?  So, in fact, sir, you are

8    assisting in identifying those people who can't be jurors

9    because of some problem that they have or some bias that they

10   have or some prejudice that they have.  But you also get to

11   pick three people just because and have them removed from the

12   jury.

13         So on both of those levels, you, sir, are selecting or

14   assisting in the selection of the jury in this case.

15         Do you understand that process?

16         MR. DJANGMAH:  Not quite.  I'm trying to-- I'm trying

17   to understand what you're saying but I'm not absorbing

18   everything right now.

19         THE COURT:  All right. Well--

20         MR. DJANGMAH:  Maybe later on.

21         THE COURT:  All right.  Do you want me to try it

22   again?

23         MR. DJANGMAH:  I don't want to waste the Court's time,

24   but I might pick it up later.

25         THE COURT:  All right, but I want to make sure you

1   understand what it is.  The point is, sir, a pile of people are

2   going to come into this courtroom.  And let's say there's 30 of

3   them.  And at random, completely at random, there'll be 15 or

4   so sitting in those chairs, maybe in the first row.  Then we're

5   going to ask the questions of those 15, and we'll see if

6   anybody gets stricken for cause, because they're biased or

7   because they can't hear, they can't see.  Some other reason.

8          And then, when we're down to, let's say, 14, then each

9   of you picks your three people you don't want and the

10  remaining -- and so it's three for you, three for them.  That's

11  six people out of 14 that we subtract from the jury and you're

12  left with eight, and that's the jury.  And then they get sworn

13  in and then they start hearing the case.  That's how the

14  selection process goes.

15         Now, I'll be there with you on Monday and we'll work

16  through-- as a group we work through this process.  But for now

17  I wanted to make sure you understood the types of questions I

18  would be asking with the hopes of identifying something about

19  the juror that would make them not fit for this trial.

20         MR. DJANGMAH:  I understand now.

21         THE COURT:  Okay?  All right.

22         So when that's done, sir, what happens is the jury

23  sits there, you got eight of them over there, and then what

24  comes opening statements.

25         MS. SELIGMAN:  Your Honor, with the Court's

DC3BDJAC                        Conference

1    permission, I have a young child at home.  I have childcare

2    issues.  May I be excused from the conference?

3              THE COURT:  I can excuse you, yes, but Mr. Beath is

4    staying.  Right?

5              MR. BEATH:  I'll be here, your Honor.

6              THE COURT:  All right.

7              MS. SELIGMAN:  Yes, with the Court's indulgence.

8    Thank you very much.

9              THE COURT:  Ms. Seligman, you will be here --

10             MS. SELIGMAN:  I will be here on Monday.

11             THE COURT:  You will.  And you also understand there

12   are things that I want in the next 24 hours.

13             MS. SELIGMAN:  And we will do our best to get them to

14   your Honor as quickly as possible.

15             THE COURT:  Which means I will get them tomorrow if

16   not sooner.  Excellent.  Thank you.

17             All right.  So once the jury, the eight of them, are

18   sitting there, they get sworn in.  And they swear that they're

19   going to do their very best to be good jurors and listen to the

20   case.  And then I tell them things that they have to know as

21   jurors:  Don't talk about the case between breaks until all the

22   evidence is in; listen to my instructions on the law; listen to

23   the evidence in the case; questions are not evidence but

24   answers are evidence.  Things like that.

25             And then we go to openings.  You go first because

1    you're the plaintiff in the first and you give an opening

2    statement.  And an opening statement is basically your preview

3    for the jury of what you think is going to be proven at the

4    trial.  And you're going to get up and explain that things

5    happened on a particular date and as a result you have suffered

6    particular things and, as a result of that, you believe that

7    excessive force was used against you and that's what they're

8    going to hear about during the trial.

9            You have basically about 15 minutes.  I don't want you

10   to think, sir, that you have hours and hours to talk about this

11   because it is really just an introduction for the jury.  It's a

12   preview for them.  What it does, sir, is it puts them in the

13   right frame of mind to hear the evidence that you're then going

14   to present.

15           You'll have a longer opportunity at the end of the

16   case to talk about what was introduced, but in this proceeding

17   you're really just talking about what you're going to say.

18   That's the opening statement.  And when you sit down, Mr. Beath

19   or Ms. Seligman gets up and they give their version of the case

20   and it's 10 to 15 minutes.

21           And then, sir, you are the plaintiff, so you go first

22   and you put your witnesses on first.  And if you want your

23   first witness to be Mr. Ivan or you want it to be Mr. Chambers,

24   then we'll talk about that and we'll put that person on.  But

25   you might find it easier, just because of your status, that you

1  go on first.  And you'll sit in the witness chair and you will

2  basically, because you are going pro se, you will speak to

3  the-- you'll tell the jury what happened.  And it's basically--

4  I don't want to say story, because that sounds like you're

5  making something up and you're not.  You're going to sit there,

6  you're going to face them and you're going to say, I am Victor

7  TR Djangmah and this is what happened to me on that night and

8  as a result this is what has happened to me.  And then, when

9  you're done -- that's basically your direct testimony, sir.  So

10 that's your testimony to the jury.

11         Then you understand Mr. Beath or Ms. Seligman is going

12 to cross-examine you, and they will ask you questions to probe

13 what you've just told the jury.

14         And then, when your testimony is done, you have your

15 other witnesses.  You've got these two individuals,

16 Mr. Chambers and Mr. Ivan.  You have two members of your

17 family.  You said your wife and one other person were going to

18 testify.

19         Then, when you're done with your witnesses, you rest.

20 And sometimes with those witnesses you might introduce

21 documents and sometimes you might not, but the real issue is

22 just getting your statements.  And you understand anyone that

23 you put on as a witness has the opportunity to be

24 cross-examined by Mr. Beath and then has the further

25 opportunity-- you get what's called redirect.  So for your--

1   let's talk about you as a witness.  You'll tell the jury, he'll

2   cross-examine you, and when he's done with cross-examination,

3   I'll say, Mr. Djangmah, would you like redirect?  And redirect

4   is you get to flesh out maybe some of the answers that you've

5   given on cross-examination.  If, for example, you said

6   something and you just wanted to give some context to an answer

7   that you've given, that's when you get to talk in redirect and

8   provide a little more of an answer.

9          And let's talk about Mr. Ivan.  If Mr. Ivan's on the

10  stand, you ask Mr. Ivan questions about what he saw, what he

11  heard, what he observed.  And then, when you're done, Mr. Beath

12  or Ms. Seligman is going to cross-examine him on his testimony

13  and may say things like, well, it was kind of dark that night

14  or maybe the weather wasn't-- I don't know what it is, but

15  there are questions in cross-examination.

16         And then you, sir, have the ability to do redirect of

17  your witness.  And you can say, Mr. Ivan, isn't it a fact

18  that... Or you can ask a couple more questions to sort of,

19  again, flesh out or provide clarification to what Mr. Ivan has

20  said in cross-examination.

21         That's how these things work.  It's triplets

22  basically:  Direct, cross-examination, redirect.  And when

23  you're done with your witnesses, you tell me, "The plaintiff

24  rests."  Then you sit down and then the defense has their

25  witnesses.  And the defense has two witnesses of which I'm

1    aware.

2              MR. BEATH:   That's correct.

3              THE COURT:   And their witness goes up.   Their first

4    witness -- let's say it's Officer Falcione himself.   Officer

5    Falcione is going to sit right there, just as you did, and he's

6    going to be asked questions by Mr. Beath and he's going to give

7    answers to those questions.

8              And if there's something inappropriate about the

9    question, I might say, I'm going to sustain an objection to

10   that question.   You're going to have to phrase it a different

11   way.   Or I may say, Speak up.   Or I may say, You're leading

12   your witness.   Don't lead your witness.   Things of that nature.

13   I get to do that because I get to control how the evidence

14   comes in to make sure that it comes in in a way that is fair,

15   that is in compliance with the Federal Rules of Evidence, and

16   that it's understandable to the jury.

17             So when their witnesses are done, right, and the

18   defense says, The defense rests, then the next step of the case

19   is summations.   You give a summation, which is you stitch

20   together all the evidence that came in in the case and how it

21   proves that you were wronged and you deserve something as a

22   result.   You deserve money as a result.

23             And then -- actually, I'm sorry, let me just say this.

24   You have the burden of proof here because you're the plaintiff.

25   So Mr. Beath is actually going to sum up first.   He's going to

1    get up and he's going to say -- because he doesn't have the

2    burden, so you, sir, as the person with the burden, you should

3    get the last word.  You should be the last person the jury

4    hears before my instructions.

5            So Mr. Beath is going to get up and say, All right,

6    jurors, you heard the evidence and here is what I think the

7    evidence shows.

8            And then you, sir, are going to get up and you will be

9    the last litigant they hear from and you will say, Ladies and

10   gentlemen of the jury, I told you at the beginning of this case

11   that you would learn X, Y and Z and, sure enough, you learned

12   X, Y and Z.  I was injured, I was wronged, the force was

13   excessive, I was hurt, here's how I was hurt, and you should

14   find in my favor.

15           There, that's how it goes.  You don't get to ask them

16   for a specific monetary amount.

17           MR. DJANGMAH:  I know that.

18           THE COURT:  Yes?

19           MR. DJANGMAH:  All this time we've been having this

20   proceeding, my spouse brought something to my attention this

21   afternoon--

22           THE COURT:  Who brought something to your attention?

23           MR. DJANGMAH:  My spouse.  My spouse.

24           THE COURT:  Your spouse.  Okay.

25           MR. DJANGMAH:  Arlene.  She was going through certain

DC3BDJAC                    Conference

1   papers and she found the vehicle's registration and the title

2   and everything.  I would like to find out from the corporation

3   counsel what, in fact, did happen to my vehicle on the night of

4   that incident?  Because when I came from detention, six months

5   after when I went to One Police Plaza, they told me that

6   Officer Falcione-- my spouse gave the vehicle to one of his

7   partners.  And I quickly called her right from the scene, right

8   from One Police Plaza, and she said, You know I wouldn't do

9   that.  We went twice to the precinct and they would not release

10  the vehicle to me.

11          I would like to find out from the Court right now that

12  where is that vehicle?

13          THE COURT:  Well, you can't find out from me because I

14  don't know.  You sent me--

15          MR. DJANGMAH:  I'm asking you to, you know --

16          THE COURT:  All right.  What you're really asking me

17  to do is order him to tell you.  But let's be clear.  That

18  doesn't have anything to do with any of the issues on trial.

19  Your trial claim is regarding excessive force.

20          If you have this document that your wife has found

21  with the vehicle information, I think you should give a copy of

22  it to Mr. Beath.  And I'm going to ask Mr. Beath to determine

23  and tell me what happened.

24          Because I believe this vehicle was impounded and then

25  it wasn't impounded.  Is that correct, sir?

DC3BDJAC                    Conference

1          MR. BEATH:  I have to check the record to see what

2     happened to the vehicle.  The question of whether the vehicle

3     was impounded and whether it was taken without due process of

4     law I don't believe was ever at issue in this case, so I can't

5     speak to that right.

6          THE COURT:  And I appreciate, Mr. Beath, that you and

7     I have come into this case after its commencement.  That being

8     said, from the very first conference I had with Mr. Djangmah,

9     he has expressed a concern about his car.  He'd like to know

10    what happened to it.  I'd like to know what happened to it.

11         Mr. Djangmah, let me say this.  I'm not going to tell

12    Mr. Beath that he has to give me the information in 24 hours.

13         MR. DJANGMAH:  All right.

14         THE COURT:  I am going to tell him that I'd like to

15    know what happened to the vehicle.  So --

16         MR. DJANGMAH:  Because of the fact that the whole

17    thing-- taking the equation of the car out, but it all involves

18    with this same vehicle.  Actually this vehicle is more or less,

19    like, how can I generalize it or say --

20         THE COURT:  You told me it was an heirloom basically.

21         MR. DJANGMAH:  I'm sorry?

22         THE COURT:  You told me it was like an heirloom.

23         MR. DJANGMAH:  Yeah, it was.  Before I came into their

24    family, that was passed on to me.  And they want that vehicle.

25    They want to know what happened to that vehicle.

1       THE COURT:  Okay.  Give Mr. Beath the information.

2   And in an appropriate time, by which I mean not too long,

3   Mr. Beath will tell us about what happened to the vehicle.

4       MR. DJANGMAH:  And you said Monday.  So Monday is just

5   going to be jury selection?

6       THE COURT:  Well, it depends, sir.  Let me explain why

7   I say it depends.  I don't mean to be not specific.  If there

8   are criminal trials that are also beginning on Monday, then

9   they take priority.  What happens here is there are many judges

10  in this courthouse and only one pool of jurors in Manhattan.

11  And so if, for example, there is a criminal trial, the criminal

12  trial will get the pool of jurors first.

13      MR. DJANGMAH:  First.

14      THE COURT:  So here's what happens.  Jurors,

15  prospective jurors, will come in on Monday morning.  They will

16  see a video about being a juror.  That will probably take them

17  till about 10:30.  Then what happens is the folks who

18  administer the jurors will say, We have a criminal trial before

19  Judge So-and-So, so I need 50 jurors to go over to Judge

20  So-and-So for the criminal trial.  If there are no criminal

21  trials, then we'll go sooner.  But if there are criminal

22  trials, we may not get jurors until 11 o'clock in the morning

23  or 12 o'clock in the morning, 12 noon, or even after that.

24      So my hope, sir, is to have the jury picked on Monday.

25  It would be my preference that the trial begins and that the

1    parties' opening statements are given.  That's my hope.

2              MR. DJANGMAH:  On the same day.

3              THE COURT:  On the same day.  Because you want the

4    jury engaged.  You've got them, they're sworn in, they're

5    ready.  They're never going to be more ready and receptive

6    than after you've sworn them in.  Especially if the openings

7    are only going to be 15 minutes a side, then why not just do

8    it and get it done?  Now, if it turns out it's three o'clock

9    and we don't have a jury, then we're going to have to wait

10   until Tuesday.  But it's my hope that we'll get openings in

11   on Monday.  At the very latest, we'll get them in on Tuesday.

12             MR. DJANGMAH:  And for this opening, and today is

13   already Tuesday, when do I get to-- you say you'll let me know

14   by tomorrow or Thursday, I believe -- to be able to speak with

15   my witnesses as well?

16             THE COURT:  Well, I understand that, sir.  But while

17   I'm here I can't check in with them.  I'm going to check with

18   the MDC tomorrow.

19             And with respect to Mr. Ivan, who is in transit, I

20   will ascertain, if I can, when it is expected that he will

21   arrive.

22             MR. DJANGMAH:  Okay.

23             THE COURT:  All right.  Now, again, counsel-- I'm

24   sorry.  Parties.  Gentlemen, let's do it this way.  What I say

25   in that document, in the voir dire that I've given to you, is

DC3BDJAC                          Conference

 1    that I anticipate this trial will take about three days.  Two

 2    to three days.  And I say that because I am imagining four to

 3    six witnesses for the plaintiff and two witnesses for the

 4    defendant.  I don't believe that any of these witnesses are

 5    going to go on for a full day, but I don't want to lie to the

 6    jury.

 7            So tell me now if you think this trial is going to

 8    go on for weeks and weeks and weeks, because I need to know

 9    that.

10            Mr. Beath, I'll start with you because you're smiling

11    more.

12            MR. BEATH:  We do not anticipate that this trial will

13    require really more than two days, three at most.

14            THE COURT:  All right.  I mean, your case is not one

15    day.  Your case is half a day, is it not?

16            MR. BEATH:  Correct, your Honor.  Our case will be

17    very short.

18            THE COURT:  All right.  Mr. Djangmah.

19            MR. DJANGMAH:  With respect to Lydia and Roger, which

20    is my brother, he has two jobs.  At the same time he takes care

21    of the kids.  And so does his wife have two jobs as well.  So

22    the balance I still have to arrange with him when it's going to

23    be.

24            And with respect to Arlene, right now she's the head

25    nurse for her floor on that day.  And she says she needs

1   something in writing, whether a subpoena or something in

2   writing so she can be able to show to her head nurse that she

3   had to leave work.

4          THE COURT:  That's interesting because subpoenas are

5   typically things that you-- you would be able to issue a

6   subpoena.  I suppose I could issue one on your behalf and we'll

7   e-mail it to Mr. Beath to give to you.  The document would

8   be --

9          MR. DJANGMAH:  You can send directly to her.  It comes

10  to the same address.

11         THE COURT:  Well, I understand that.  What I'm saying

12  is what's unusual, sir, is the head nurse is going to see a

13  document in which you are asking me to command your wife to

14  appear at the trial.  And if the nurse is going to accept that,

15  that's fine.

16         MR. DJANGMAH:  Yeah, just something in writing because

17  she has to be there.

18         THE COURT:  Fine.  I can do that.  All right.

19         With respect to your brother, do you want to make

20  arrangements?

21         MR. DJANGMAH:  Yes, as well.

22         THE COURT:  Does he need a subpoena too?

23         MR. DJANGMAH:  Yes, because he has two.  He just

24  started a new job, you know, in a hotel.

25         THE COURT:  Okay.

1          MR. DJANGMAH:  So he's on a probationary period

2    right now so he say he might need some type of excuse from the

3    Court.

4          THE COURT:  Your wife's name is spelled how?

5          MR. DJANGMAH:  A-r-l-e-n-e, Arlene.

6          THE COURT:  Last name.

7          MR. DJANGMAH:  M-i-s-k-a-r:

8          THE COURT:  And your brother, Roger.

9          MR. DJANGMAH:  Same last name, yes.

10          THE COURT:  Okay.

11          MR. DJANGMAH:  And I don't think Lydia --

12          THE COURT:  Well, Mr. Ivan already has his court --

13    I've already ordered him to appear.  I'll find out what I need

14    to do with respect to Mr. Chambers.

15          Excuse me a moment.

16          All right.  Mr. Djangmah --

17          MR. DJANGMAH:  I'm going to eliminate my mom because

18    she's not in good health right now.

19          THE COURT:  Okay.  So we have Mr. Chambers, Mr. Ivan.

20          MR. DJANGMAH:  Mr. Chambers, Ivan, Arlene, Roger and

21    Lydia.

22          THE COURT:  Lydia?

23          MR. DJANGMAH:  Lydia, my aunt.

24          THE COURT:  But we had said one additional family

25    witness.  So pick your brother or Lydia.  I don't care which of

DC3BDJAC                            Conference

1       them, but pick one.

2                   MR. DJANGMAH:  I'm going to have to think about that

3       overnight.

4                   THE COURT:  All right.  Can you, when this conference

5       ends, write down on a piece of paper the addresses for

6       Ms. Miskar and Mr. Djangmah?  Because our subpoena form

7       requires the address and the name.

8                   MR. DJANGMAH:  Okay.

9                   THE COURT:  Okay.  Mr. Djangmah, I'm back to my

10      original question.  Three days?  We can be done in three days?

11                  MR. DJANGMAH:  I'm hoping.

12                  THE COURT:  I'm hoping too.  All right.

13                  We've had discussions today, we've had a lot of

14      discussions today, but to the extent there are plaintiff's

15      exhibits and defendant's exhibits that are marked, I would like

16      them by Friday so I can read them over the weekend.

17                  Mr. Djangmah, what I mean by marking an exhibit is

18      they make stickers, but you can also write on it, Plaintiff's

19      Exhibit 1.  We're doing plaintiff's with numbers and

20      defendant's with letters?

21                  MR. BEATH:  Yes, your Honor.

22                  THE COURT:  Fine.  So the defense exhibits will say

23      Defense Exhibit A, Defense Exhibit B.  I'm not sure what they

24      are, I'm not sure I'm going to let them in, but they're at

25      least supposed to be what that want to put in.  If there are

DC3BDJAC                              Conference

1    documents that you want to put in, based on whatever rulings I

2    issue very soon on these other matters, then you would say

3    Plaintiff's Exhibit 1.  Because I need to see what these

4    documents are because we're going to probably show them to the

5    jury.  So you don't want to have, sir, a copy that's all

6    highlighted and marked up or whatever.  You want the original

7    document with a notation on it that it is a Plaintiff's Exhibit

8    so we can introduce it at the trial and you can show it to the

9    jury.

10          Do you understand what I'm talking about?

11          MR. DJANGMAH:  Can you please elaborate on that?

12   Because you're saying it's too late to bring in anything so--

13          THE COURT:  Well, I'm not sure what's left after my

14   decision because I haven't decided the Newbridge issue because

15   of this-- and I have to look at the shooting issue and then

16   there are these Harlingen records.

17          To the extent, though, that there are documents that

18   you are permitted to introduce and that folks can speak to and

19   say, Yes, this is my document, the way in which those documents

20   are marked, so that everybody is on the same page, everybody

21   knows what they are, is to call them plaintiff's exhibits or

22   defendant's exhibits, depending on who's putting them forward.

23          So we may be deciding this at the trial.  I'm just

24   telling you, sir, that you'll want to have a copy of the

25   documents that does not have highlighting and notes to yourself

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    because that can't go to the jury.  You don't want them to see

2    your inner thoughts on these documents.

3            Do you understand what I'm saying?

4            MR. DJANGMAH:  Yes.

5            THE COURT:  Okay.  All right.  There is one final

6    issue and it's a legal issue.  It's unfortunate it's this late

7    in the day to be discussing it, but is the City taking the

8    position that Officer Falcione, even if he is found to have

9    committed excessive force, is nonetheless eligible for

10   qualified immunity?  And can you even have qualified immunity

11   in an excessive force case?

12           MR. BEATH:  I think I can conceive of situations where

13   an officer could have qualified immunity in an excessive force

14   case.  I think the way we're proceeding at this point, we don't

15   expect to be making a qualified immunity motion.

16           THE COURT:  That's all I need to know.

17           Mr. Djangmah, let me explain to you what we were

18   talking about because I want to make sure you understand this.

19   For certain constitutional violations, and I'm not sure that

20   this one is one of them --

21           MR. DJANGMAH:  I'm very aware of the Eleventh

22   Amendment and the immunity of the officers, so go ahead.  I'm

23   listening.

24           THE COURT:  All right.  Why I raised the issue is that

25   in order -- qualified immunity is a very weird concept in this

 1    district.  The jury answers factual questions, but the judge

 2    decides the qualified immunity issue after trial.  And I raise

 3    that because what I'm likely to do is to propose to the

 4    parties-- well, if there was going to be a qualified immunity

 5    argument, I'd want to get some questions together to have the

 6    jurors answer as part of the verdict.

 7         But Mr. Beath is telling me now that there is not a

 8    qualified immunity argument, so I don't even need to talk about

 9    these questions because the issue is not going to be raised.

10    That's the point.  We are being told, you and I, that they are

11    not raising a qualified immunity defense.  Therefore, the law

12    and the special questions that come into play don't come into

13    play.  So I've gotten the clarification that I needed.

14         All right.  As we enter our third hour of this

15    conference, let me ask the parties if there's anything else

16    that they want to address and bring to my attention at this

17    time.

18         Mr. Djangmah.

19         MR. DJANGMAH:  I don't know whether to say this or to

20    advise corporation counsel that just be aware that the family

21    of the victim that was shot might be in this courtroom at the

22    time of this trial.  So I'm just letting him know that.

23         THE COURT:  They might be but I might not let you

24    refer to them as such.  They can sit here.  They are members of

25    the public.

1          MR. DJANGMAH:  Exactly.

2          THE COURT:  But if I don't let you talk about it, then

3     you can't say, oh, and here in the back of the courtroom in the

4     family of the guy that he shot, because what you'd be doing is

5     trying to poison the well with the jurors.  So they are

6     members of the public.  They are allowed to be in this

7     courtroom, but I'm not going to have you derail the trial if I

8     make the decision that the questions can't be asked about the

9     shooting.

10          Again, I need the documentation regarding that as soon

11     as the parties can get it to me.

12          MR. BEATH:  Yes, your Honor.

13          THE COURT:  Mr. Djangmah, I understand what you've

14     said and I appreciate that the family may be there.

15          Is there anything else, Mr. Djangmah, that you want to

16     bring to my attention at this time?

17          MR. DJANGMAH:  No.

18          THE COURT:  Okay.  Mr. Beath, is there anything you

19     wish to bring to my attention at this time?

20          MR. BEATH:  Yes, your Honor, just a couple of things.

21     One is that Dr. Rao, who was his treating physician,

22     Mr. Djangmah's, on the night of the incident, is one of our

23     witnesses.  It's difficult for him to come to court to testify

24     on a day other than Monday.  So to the extent the Court is able

25     to accommodate it, we would be very appreciative if the

1    schedule could be arranged such that he could testify on

2    Monday.

3             THE COURT:  I don't even know that we'd be-- I mean, I

4    understand the request and I'm not interested in complicating

5    Dr. Rao's life.  That being said, we may not even have a jury

6    Monday.  So it does seem to be putting the case in a really

7    awkward position to begin with that.

8             I mean, Mr. Djangmah, you may want to begin with the

9    doctor who treated you at St. Barnabas, but you may not.

10            So can I give Dr. Rao the same subpoena we've been

11   getting for Ms. Miskar and Mr. Djangmah?  I mean--

12            MR. BEATH:  Yes.  And we've subpoenaed him so

13   ultimately I think we could make him appear on another day.

14   But to the extent it's possible --

15            THE COURT:  I don't think it is.

16            MR. BEATH:  Okay.

17            THE COURT:  Again, I'm not interested in complicating

18   his life, but just looking at the way that I think this is

19   going to develop, I think it's going to complicate

20   Mr. Djangmah's case to throw a defense witness into it.

21            MR. BEATH:  Okay.  I wanted to make the request.

22            THE COURT:  I understand.  It is unfortunate, but I

23   don't think it's appropriately granted.  Again, we have

24   Ms. Miskar and Mr. Djangmah, the brother, who also have work

25   schedules that will have to be, unfortunately, affected by

DC3BDJAC                         Conference

1    this.

2              All right.

3              MR. DJANGMAH:  And this is going to be for the

4    three-day period?

5              THE COURT:  Which "this" is that, sir?

6              MR. DJANGMAH:  This is going to be for three days.  Do

7    they have to be here every day?

8              THE COURT:  No, sir.

9              MR. DJANGMAH:  Tuesday or Wednesday?

10             THE COURT:  Well, the issue you have, sir, is you have

11   two incarcerated folks and these two folks.  So my thought --

12   and maybe you just revisit this on Monday -- is that you have

13   as many of the witnesses as you can get on the stand on Tuesday

14   on Tuesday.  For example, maybe you get in the morning you get

15   Mr. Ivan and Mr. Chambers, and maybe in the afternoon you get

16   Ms. Miskar and Mr. Djangmah.  And somewhere in there you get

17   yourself or you try and get yourself on Monday depending on

18   where the jury is.

19             There's a little bit of movement we have.  If we're

20   coming-- my trial day ends at 2:30 so that people can go back

21   to their jobs.  If it turns out that we're at 2:30 and there's

22   one more witness, I might ask the jurors' indulgence to stay

23   until three.  I'm not going to have them stay until six, but I

24   can have them stay a half an hour, 45 minutes longer so that

25   the witnesses don't have to take a second day off from work.

1          So why don't you aim to have Ms. Miskar and

2     Mr. Djangmah, or your Aunt Lydia -- I'm sorry, I don't know her

3     last name -- on Tuesday.  And we'll try and ensure that the two

4     incarcerated defendants are also ready on Tuesday.

5          Does that make the most sense?

6          MR. DJANGMAH:  Yes, ma'am.

7          THE COURT:  All right.  Is there anything else?

8          MR. BEATH:  One last thing, your Honor.

9          THE COURT:  Yes.

10          MR. BEATH:  This should be easy, hopefully.  Courtroom

11     technology, just as far as showing exhibits to the jury, is

12     that just by paper copy or is there courtroom technology

13     available and will there be time for the parties to use that?

14          THE COURT:  Okay.  The answer is I've had it done both

15     ways.  I've had several trials where the paper copies of

16     exhibits are shown to the jury.  But as you see, there's a

17     screen in front of you; there are screens in front of the

18     jurors.  And though I don't know -- and perhaps Mr. Lopez knows

19     the exact person that we have to talk to -- there are

20     audiovisual people that can tell you how to hook up your

21     computer to one of these things.  So that, for example, if your

22     exhibits are scanned, you can present them on a screen rather

23     than handing out paper copies.

24          So the answer is the technology exists.  I don't know

25     how to use it.  But somebody in the courthouse has to know how

1  to use it.

2              MR. BEATH:  Okay.

3              THE COURT:  Either way, I mean, yes, you can also hand

4  out paper copies too.

5              MR. BEATH:  Great.

6              THE COURT:  All right.

7              MR. BEATH:  One last thing.

8              THE COURT:  No, you just said it was the last thing.

9              MR. BEATH:  I know.  I'm sorry.  Now that we know that

10  Devon Chambers, it appears, will be testifying at the trial,

11  defendants may want to attempt to take a deposition from him

12  between now and the time of trial.  That's obviously something

13  we're going to have to talk to MDC about.

14              THE COURT:  Good luck.

15              MR. DJANGMAH:  I object.

16              THE COURT:  I understand that you object.  I--

17              MR. DJANGMAH:  Because they already took his

18  deposition during the summary judgment already.

19              THE COURT:  They took the deposition of Mr. David.

20  Did they take it of Mr. Chambers?

21              MR. DJANGMAH:  I believe so because I did authorize, I

22  did sign that, for them to do that and they tried getting him.

23  And I don't know when they took it, but I believe they did take

24  a deposition of him.

25              MR. BEATH:  There was no deposition.

DC3BDJAC                    Conference

1        MR. DJANGMAH:  I don't know what kind of deposition

2    again they want to take of him as far as...

3        THE COURT:  I think it's too late.  I'm not saying you

4    can't put yourself on the same visitors list and meet with him

5    and see if he'll talk to you, but in terms of a formal

6    deposition I think we're too close to trial.

7        Okay.

8        MR. DJANGMAH:  And I have a question as well.  Within

9    all this short period of time, the Court has not let me know

10   when I'll be able to-- whether we visit him or be able to

11   prepare him for the trial.  Since they have enough time to

12   prepare Officer Falcione for the trial, so I think I do need

13   the same respect to have time to talk to my witness as well.

14       THE COURT:  Well, all right, but let me note this.

15   You've had time to prepare-- their principal witness is Officer

16   Falcione and they've had whatever time they've had to prepare

17   Officer Falcione.  Your principal witness is you and you've had

18   time to prepare yourself.

19       So I will speak with the MDC tomorrow and once I hear,

20   I will advise the parties as quickly as I'm able to, but that's

21   all I'm going to do.

22       MR. DJANGMAH:  So how do I get to him?  I'm not going

23   to wait until one minute, five minutes before trial to try to

24   prepare my client.  I'm not--

25       THE COURT:  He's not your --

DC3BDJAC                          Conference

1            MR. DJANGMAH:  My witness.

2            THE COURT:  Your witness.

3            MR. DJANGMAH:  Yes.

4            THE COURT:  I understand that.

5            MR. DJANGMAH:  I need time before the jury to be able

6    to prepare my witness.  It's not in my power that wherever he

7    is, I try to make a visit there and they have protocols to

8    follow.  The time is very limited.  I don't think it's fair for

9    me to wait to the time he's brought in here to the back for me

10   to try to talk to him.

11           THE COURT:  I understand your position.  I said to you

12   earlier I will speak with the MDC tomorrow and I will let you

13   know what information they have for me.  That's all I'm going

14   to commit to.

15           MR. DJANGMAH:  Okay.

16           THE COURT:  All right.  We all have things to do in

17   the next 24 hours.

18           Mr. Beath, I want everything that you think you should

19   be giving me regarding the shooting.

20           MR. BEATH:  Yes.

21           THE COURT:  And, Mr. Djangmah, I want you to let us

22   know by the end of the day tomorrow whether your witness will

23   be your aunt or your brother.

24           MR. DJANGMAH:  Okay.

25           THE COURT:  Either way, before you leave tonight, I'd

DC3BDJAC                    Conference

1   ask you to give me the addresses for Ms. Miskar and your aunt

2   and your brother so that we can prepare the subpoenas so that

3   whichever two are the two you choose, we can issue subpoenas

4   immediately.  Once you tell me who your two witnesses are,

5   we'll send the subpoenas right away and we'll do them for all

6   three individuals.  But in order to do that I do need, before

7   you leave tonight, the addresses.

8            MR. DJANGMAH:  Okay.

9            THE COURT:  All right.  I have a set of the Harlingen

10  medical records.

11           Do we have a set of those?

12           MR. DJANGMAH:  I didn't get my copy.

13           THE COURT:  I have your set still.  I will make one

14  copy of those and we'll give them back to you.  He will make a

15  copy of that.

16           MR. DJANGMAH:  May I have a clean sheet of paper so I

17  can write that down?

18           THE COURT:  Sure.

19           All right.  And then, Mr. Beath, can you get the

20  transcript of today's proceeding?

21           MR. BEATH:  Yes.

22           THE COURT:  Thank you.

23           MR. BEATH:  Also, if I can get a copy again of that

24  document that Mr. Djangmah provided to the Court.

25           THE COURT:  You're talking about the release form?

1          MR. BEATH:  Right.

2          THE COURT:  Yes.

3          MR. BEATH:  Thank you.

4          THE COURT:  All right.  It goes without saying,

5    gentlemen, that in the week before trial, a lot of things

6    happen, a lot of things are moving.  I understand that.  I will

7    let you know as soon as I'm aware of information and I expect

8    that you will let me know as quickly as possible when you have

9    information.

10          Mr. Djangmah, if you have any issues, e-mail

11   Mr. Beath, who will get the information to me and I will e-mail

12   him to get the information to you since you're not on ECF

13   proper, sir.

14          MR. DJANGMAH:  Okay.

15          THE COURT:  All right.  Anything else?

16          MR. BEATH:  Nothing from defendant, your Honor.

17          THE COURT:  All right.  Nothing from you,

18   Mr. Djangmah?

19          MR. DJANGMAH:  I just want to thank you very much.  I

20   learned something today.  I'm not going to tell you what I

21   learned, but I'm going to go pull your research up.  I just

22   want to thank you and ask you to-- I apologize for my

23   composure, of getting a little emotional.  I'll try to stay as

24   professional as I could.

25          THE COURT:  I appreciate that, sir.  And understand

DC3BDJAC                       Conference

1    I'm on no one's side here.  All I care about is that everybody

2    knows what they need to know.  So that's why I've given you all

3    of the rules that I've given you cites to.  You'll have a lot

4    of reading.  I understand that.

5            All right.  Thank you, both, and you'll thank

6    Ms. Seligman and we'll start getting this remaining

7    information.  Thank you.

8            MR. BEATH:  Thank you, your Honor.

9            MR. DJANGMAH:  Thank you, Judge.

10           (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25